**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GULFPORT ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-35562 (DRJ) |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |
| | § | |
| GULFPORT ENERGY CORPORATION, | § | |
| | § | |
| Plaintiff, | § | Adv. Pro. No. 20-____ |
| | § | |
| v. | § | |
| | § | |
| MIDSHIP PIPELINE COMPANY, LLC, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT

Gulfport Energy Corporation ("Gulfport Energy," "Gulfport," or "Plaintiff"), a debtor and

debtor in possession in the above-captioned chapter 11 cases (together with its affiliated debtors,

the "Debtors"), alleges for its Complaint against Defendant Midship Pipeline Company, LLC

("Midship Pipeline," "Midship," or "Defendant"), upon knowledge of its own acts and upon

information and belief as to all other matters, as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Gulfport Energy Corporation (1290); Gator Marine, Inc. (1710); Gator Marine Ivanhoe, Inc. (4897); Grizzly Holdings, Inc. (9108); Gulfport Appalachia, LLC (N/A); Gulfport MidCon, LLC (N/A); Gulfport Midstream Holdings, LLC (N/A); Jaguar Resources LLC (N/A); Mule Sky LLC (6808); Puma Resources, Inc. (6507); and Westhawk Minerals LLC (N/A).  The location of the Debtors' service address is:  3001 Quail Springs Parkway, Oklahoma City, Oklahoma 73134.

## INTRODUCTION

Midship seized $75.6 million from Gulfport Energy by improperly drawing on a letter of credit. This lawsuit seeks to recover that $75.6 million, as well as punitive damages, to address Midship's breach and wrongful conduct.

In March 2017, Midship and Gulfport executed a Precedent Agreement for the transportation of natural gas (together with its amendments, the "Agreement"). The parties amended that agreement four times over the next three years to increase Gulfport's minimum volumes and address Midship's construction delays. The parties agreed in the most recent of those amendments ("Amendment No. 4," dated June 2020) to restructure the volume requirements and the credit assurance terms over the life of the Agreement such that Gulfport was to provide Midship $32.9 million as a prepayment for reservation charges ("Prepayment"). Thereafter, Gulfport was to provide Midship a $34 million surety bond ("Surety Bond") in exchange for Gulfport being able to reduce the amount of the posted Letter of Credit ("LC") already in place from $75.6 million to $12.2 million. Although Gulfport wanted to defer this fourth amendment until other terms then under discussion (*e.g.*, lower volumes and rates) were finalized, Midship implored Gulfport to finalize the amendment in order to satisfy Midship's creditors. Midship assured Gulfport that the additional terms being discussed would be quickly negotiated into another amendment.

On September 28, 2020, in accordance with Amendment No. 4, Gulfport paid Midship the $32.9 million Prepayment. In the days following that payment, while the parties discussed the specifics for effectuating the exchange of the new $34 million Surety Bond and the corresponding $63.4 million reduction to the LC, without any notice to Gulfport, Midship suddenly instead drew down the full $75.6 million LC. Midship later claimed that it did so because Gulfport failed to provide the Surety Bond before October 1, as required in Amendment No. 4. Midship's draw on the LC violated the parties' Agreement. The Agreement only permits Midship to draw on the LC

2

if Gulfport owes "money, obligations and/or liabilities" to Midship and, even then, the Agreement limits any draws to the specific amounts owed.  Gulfport owed nothing to Midship.  Midship took these actions *after* Gulfport had just made a $32.9 million Prepayment and still maintained the $75.6 million LC.  At the time it submitted this $75.6 million draw (the "Draw Demand"), Midship held $108.5 million of total credit assurance when it was only contractually entitled to $79.2 million.  Any brief delay in Gulfport's delivery of the Surety Bond did not reduce Gulfport's total credit assurance or otherwise harm Midship.  In contrast, Midship's actions drawing from the LC were unauthorized by the Agreement and relied upon false statements.

So why did Midship do this?  Midship wanted to hold the $75.6 million hostage during the negotiations of a potential fifth amendment to the Agreement and to build a cash reserve in anticipation of a potential Gulfport bankruptcy.  Midship was fully aware of Gulfport's financial distress in the weeks leading up to the draw, having described the possibility of a Gulfport bankruptcy filing as "imminent" in a September 21, 2020 filing with the Federal Energy Regulatory Commission ("FERC").  Knowing that Gulfport owed it no money—and with a $32.9 million Prepayment from Gulfport already in hand—Midship falsely represented to the Bank of Nova Scotia ("Scotia Bank") that Gulfport owed Midship money as the basis for the $75.6 million draw.  Not only was the draw a breach, Midship's conduct in effectuating that draw was egregious and commercially unreasonable.  Midship's actions exacerbated Gulfport's liquidity crisis.  Midship continues to harm Gulfport and benefit itself by improperly holding the Debtors' funds.

Midship now claims that it drew down the $75.6 million because Gulfport did not provide a $34 million Surety Bond by October 1, 2020.  Midship's position is contrary to the plain contract language:  Midship claims that Gulfport's failure to post a $34 million Surety Bond entitled it to

draw **more than double** that amount against the LC.  Midship's position is also at odds with its communications with Gulfport in the days leading up to the draw, in which the parties were actively discussing the LC reduction that would occur when Gulfport posted the Surety Bond. Midship never suggested that if Gulfport did not post the Surety Bond before October 1 it would claim breach—much less that it would seize the entire $75.6 million from the LC as its purported remedy.  Midship cannot credibly argue that it was concerned with Gulfport's ability to post the bond—Gulfport provided Midship the $34 million Surety Bond that it was ready to execute on the day Midship made its Draw Demand (five days before Scotia Bank dispersed the LC funds to Midship).  Midship refused to withdraw its Draw Demand, however, and persisted in its wrongful conduct, ultimately seizing the $75.6 million.

Nothing in the Agreement contemplates such an outcome.  Tellingly, Midship continues to seek to extract as much cash from Gulfport as possible by billing Gulfport at the Amendment No. 3 volume commitment levels in its most recent invoice, ignoring the new volume levels agreed to in Amendment No. 4. But while Midship has—again unilaterally and without any notice or explanation—invoiced Gulfport at the volume levels from the **prior** amendment, it continues to hold the $32.9 million Prepayment Gulfport made pursuant to Amendment No. 4, **and** refuses to relinquish the $75.6 million it unlawfully drew down on Gulfport's LC.  There is absolutely no conceivable basis for Midship to do all three of these things at once, other than the unifying theme of Midship acting on its knowledge of Gulfport's imminent restructuring to seize as much Gulfport pre-petition cash as possible, regardless of its lack of legal basis for doing so.

* * * * *

To obtain leverage in ongoing contract negotiations and secure an advantageous cash position prior to Gulfport's bankruptcy, Midship made false statements to Scotia Bank and

4

wrongfully drew $75.6 million from the LC.  Since then, Midship has never offered any factual support for its representation in the Draw Demand that Gulfport owed Midship $75.6 million. Midship acted in bad faith, causing substantial ongoing harm to Gulfport by materially reducing its liquidity position.  Its Draw Demand lacked any financial or contractual basis, violated the Agreement, and relied on false statements.  Gulfport brings this action to recover the $75.6 million to the Debtors' estate, as well as compensation for Midship's breach and wrongful conduct in the form of actual and exemplary damages, applicable pre- and post-judgment interest, and any fees and costs available under the law.

### PARTIES AND JURISDICTION

1.      Plaintiff Gulfport Energy Corporation is a Delaware limited liability company with its principal place of business in Oklahoma.

2.      Upon information and belief, Defendant Midship Pipeline Company, LLC is a Delaware limited liability company with its principal place of business in Texas.

3.      Midship Pipeline Company is a wholly owned subsidiary of Cheniere Energy, Inc., ("Cheniere").  Cheniere is a Delaware corporation with its principal place of business in Texas.  It is the leading producer and exporter of liquefied natural gas in the United States.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules"), to the entry of a final order by the Court.

5.      Venue is proper pursuant to 28 U.S.C. § 1409.

## BACKGROUND

**1.     The Precedent Agreement**

6.     The Midship Pipeline is a 200-mile, 36-inch diameter pipeline that transports natural gas from the STACK and SCOOP shale plays in Oklahoma's Anadarko Basin.

7.     On March 15, 2017, Gulfport and Midship entered into the Precedent Agreement. *See* Ex. A, Mar. 15, 2017 Precedent Agreement.  Gulfport committed to ship at least 175,000 dekatherms ("DTH") of natural gas per day for ten years.  *See id.* § 1(A).  In exchange, Midship agreed to provide uninterrupted transportation service ("Firm Service") at agreeable rates. *Id.* The Precedent Agreement provided that transportation service would begin in April 2019 unless the pipeline was not placed into service until a later date. *See id.* § 1(B).  It also provided that the parties would enter enter into a Service Agreement, consisting of a gas transportation agreement ("FTS Agreement") and a negotiated rate firm transportation agreement ("Negotiated Rate Agreement"), which would set forth the specific terms of the Firm Service, including the transportation rates and quantities (the "Maximum Daily Transportation Quantity" or "MDTQ"). The MDTQ functions as a reservation of pipeline capacity, and thus serves as both the maximum volume that will be transported and the minimum volume that will be invoiced.

8.     The Precedent Agreement required Gulfport to provide credit assurances in the form of a Letter of Credit, Guaranty, cash deposit, or other "agreeable alternative form of credit assurance."  *See* Ex. A § 3(C)(ii).  The Precedent Agreement specifically restricted Midship from drawing against its credit assurance for more than what Gulfport owed: "[Midship] shall not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the extent such draw is necessary to cover amounts that are due and owed by [Gulfport] in accordance with the applicable provisions of this Agreement, the Tariff and/or under the Service Agreement, as

applicable, and which amounts have not been timely paid by [Gulfport] in accordance with the terms hereof or under the Service Agreement, as applicable." *Id.*

9.      On February 15, 2019, pursuant to the credit assurance requirements, Gulfport secured a $75.6 million LC from Scotia Bank, which remained in place until Midship's improper draw on October 2, 2020.

10.      Midship was late in getting the pipeline in service and did not actually begin service until the second quarter of 2020, more than a year after the April 2019 date provided in the Agreement.  Gulfport thereafter began moving gas on the pipeline and shipped approximately 24,334,072 DTH of gas through September 2020.  Gulfport timely paid Midship $11.9 million for the volumes shipped.   Indeed, Gulfport ***never*** missed a payment to Midship.

**2.      The Amendments to the Precedent Agreement**

11.      The parties amended the Precedent Agreement three times between 2017 and February 2020.  *See* Ex. B, June 14, 2018 Amendment No. 1 to Precedent Agreement; Ex. C, Jan. 10, 2019 Amendment No. 2 to Precedent Agreement; Ex. D, Feb. 21, 2020 Amendment No. 3 to Precedent Agreement.  These amendments increased Gulfport's volume commitments, all while Midship continuously failed to meet the deadlines for commencing pipeline operations and initiating Gulfport's shipments under the Agreement.  On July 13, 2020, the parties executed Amendment No. 4 to the Precedent Agreement.  *See* Ex. E, July 13, 2020 Amendment No. 4 to Precedent Agreement.

12.      By executing Amendment No. 4, the parties amended the timing of Gulfport's volume commitment over the life of the Agreement and increased the total credit assurance posted, from $75.6 million in the form of a letter of credit to $79.2 million in the form of a Prepayment, Surety Bond, and a letter of credit.   Midship agreed to lower Gulfport's MDTQ as of October 1, 2020, in exchange for Gulfport making a $32.9 million Prepayment to Midship by

September 28, 2020, and posting the $34 million Surety Bond before October 1.  Gulfport was

accordingly entitled to reduce the LC to $12.3 million upon posting the $34 million Surety Bond

and making the $32.9 million Prepayment.  Midship understood that the LC reduction was a key

aspect of Amendment No. 4:  according to Midship, the amendment provided "immediate liquidity

enhancement by allowing the LC to come down from ~$76M to ~$12M, plus ~$33M prepay, on

October 1."  *See* Ex. F, Aug. 14, 2020 Email from M. Manteris (Cheniere VP) to T. Peck (Gulfport

Senior Vice President).

13.     Amendment No. 4 specifically limits the funds that Midship may draw against the

LC to "amounts that are due and owed" by Gulfport.  *See* Ex. E § III(1) (amending Agreement

§ 3(C)(v)).  The Precedent Agreement contained similar language requiring that, "[Midship] shall

not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the

extent such draw is necessary to cover amounts that are due and owed by [Gulfport]. . . and . . .

have not been timely paid by [Gulfport]."  *See* Ex. A § 3(C)(ii).  Thus, the parties' Agreement

reflected at all times that Midship would be allowed to draw on the LC ***if and only if*** amounts were

due and owed by Gulfport, and that the LC may only be drawn from ***"in an amount equal to"*** the

amount of any funds owed.  Ex. E § III(1) (emphasis added) (amending Agreement § 3(C)(v)).

14.     Amendment No. 4 Section III(1), which amends Agreement Section 3(C)(v), limits

draws to the following three circumstances, presented in the conjunctive:

> (a) any credit assurance . . . may be claimed, drawn or utilized by [Midship] ***in an
> amount equal to*** any and all ***money, obligations and/or liabilities due, owing or
> incurred*** to [Midship] by [Gulfport] . . . ,

> (b) notwithstanding anything to the contrary in a Letter of Credit or Surety Bond,
> any Letter of Credit or Surety Bond may be drawn immediately and in full by
> [Midship] if (i) any Letter of Credit or Surety Bond is not maintained or replenished
> in accordance with its terms or the terms of this Agreement or the Service
> Agreement (or otherwise become invalid or unenforceable except as permitted by
> this Agreement) or [Midship] receives notice that the provider of a Letter of Credit
> or Surety Bond is not renewing or extending such credit assurance or is otherwise

terminating such credit assurance, (ii) any Required Letter of Credit Increases (as defined in Section 3(C)(vi) below) do not occur by the Required Posting Deadlines (as defined in Section 3(C)(vi) below) or the Pre-Payment Amount or Surety Bond is not received by [Midship] by the date specified in Section 3(C)(vi) below, or (iii) [Gulfport] becomes Insolvent or terminates the Service Agreement (including taking action the purpose of which is to terminate the Service Agreement),

*and*

(c) as among any form of credit assurance provided by [Gulfport] to [Midship], including as between a Letter of Credit and any Surety Bond, such support may be drawn in any order determined by [Midship].

Ex. E § III(1) (emphasis added) (amending Agreement § 3(C)(v)).  These sub-sections are stated in a single sentence and connected by "and," not "or."  Thus, all three sub-sections must be satisfied for Midship to draw against the LC by any amount.  And that makes sense:  the only reason to draw against credit assurance instruments is if an amount is owed and not otherwise secured—and even then, the amount to be drawn is limited to the amount actually owed.  By its terms, the Agreement does not permit Midship to unilaterally draw down the LC in an amount of its choosing in response to a perceived contract performance issue.  Midship did not satisfy the three required conditions in Section 3(C)(v) when it made its draw on October 2, 2020, and it did not limit its draw to the amount it alleges it was owed, as that provision requires in any event, and as is discussed in more detail below.

3.     **Midship's Improper $75.6 Million Draw Against the Letter of Credit**

15.     Midship and Gulfport began negotiating a fifth amendment to the Precedent Agreement in mid-September 2020.  Gulfport sought adjusted volume commitments and increased liquidity, and both parties offered revisions to the credit assurance provisions.  While these negotiations were underway, Gulfport continued to satisfy its obligations under the Agreement—as it had done at all times since the inception of the Agreement.

16.     Throughout these negotiations, Midship knew that Gulfport was in financial distress.  On September 21, 2020, Midship filed a Petition for Declaratory Order and Request for Expedited Action with FERC, asking FERC to "issue a declaratory order to remove any potential uncertainty as to whether Sections 4 and 5 of the Natural Gas Act ('NGA') provide the Commission concurrent jurisdiction with the United States Bankruptcy Courts with respect to the potential rejection of a Commission-jurisdictional firm transportation service agreement, negotiated rate agreement, and associated surviving terms in a 'Foundation Shipper' precedent agreement, all as amended and on file with the Commission ('Jurisdictional Contract'), between Midship and Gulfport Energy Corporation ('Gulfport')."  *See* Ex. G, Sept. 21, 2020 Midship's Pet. for Declaratory Order, *Midship Pipeline Co.*, No. RP20-1202 (FERC).  Midship asserted in this FERC filing that it "must prepare for the imminent possibility that Gulfport may file for bankruptcy," citing the depressed commodity prices and liquidity constraints raised in Gulfport's most recent Form 10-Q.  *Id*. at 8-10.

17.     In accordance with Midship's completion of certain conditions precedent under Amendment No. 4, Gulfport was due to post the Surety Bond before October 1.  Gulfport and Midship communicated multiple times each day in the final days of September regarding the credit assurance requirements, term sheets, and ongoing negotiations for a potential fifth amendment.  *See, e.g.*, Ex. H, Sept. 22, 2020 Email from Q. Hicks (Gulfport CFO) to M. Manteris (Cheniere VP) (discussing timing of counterproposals and details on revised credit assurance); Ex. I, Sept. 24, 2020 Email from M. Manteris to Q. Hicks (sending Midship's Amendment No. 5 Term Sheet and highlighting changes to MDTQ, term, rate, and credit assurance).  Gulfport understood that both parties were working in good faith to negotiate a fifth amendment and were raising essential issues.  Specifically, Gulfport relied on Midship's express promise to act in good faith

with respect to those negotiations: "Midship understands that the conditions of Gulfport entering into the Service Agreement Amendment at this time is Midship's agreement that (a) to the extent requested by Gulfport, Midship shall negotiate in good faith regarding a further amended agreement that considers Gulfport's long term needs." Ex. J, Aug. 24, 2020 Email from L. Cohen (Midship Treasurer) to Q. Hicks *et al.*

18.      When Midship submitted the Draw Demand, Gulfport did not owe Midship any money under the Agreement, and Midship had full credit assurance in support of Gulfport's obligations: a $32.9 million Prepayment and a $75.6 million LC.

19.      To be clear, Gulfport requested during negotiations that it be permitted to provide a portion of the credit assurance in the form of a Surety Bond in order to reduce the amount of its LC.  Doing so would free up Gulfport's overall liquidity because outstanding surety bond amounts do not reduce availability under its revolving credit agreement while LCs do. Midship, however, had repeatedly indicated its preference for a letter of credit over a Surety Bond, as it preferred one consolidated instrument that would create a primary obligation and that could be immediately drawn from on demand.  Since it was Gulfport, and not Midship, that had requested a Surety Bond in exchange for a reduction in the amount of the LC, Gulfport had no reason to anticipate that Midship would take issue with any delay in delivery of the Surety Bond, much less that it would seek to fully draw against the LC on that basis.

20.      Throughout the parties' discussions, Midship never once informed Gulfport that Midship intended to claim that it was entitled to any relief under the Agreement, nor did Midship ever give notice that it planned to draw down the full amount of the LC as its purported remedy.

**Monday, September 28, 2020**

11

21.     On Monday, September 28, Gulfport wired to Midship $32.9 million in immediately available funds in accordance with Amendment No. 4 Section III(1) as a "prepayment for reservation charges (and any Covered Obligations)."   Ex. E § III(1) (amending Agreement § 3(C)(vi)).   The $75.6 million LC remained in full effect at this point.   Thus, as of September 28, Gulfport had provided Midship $108.5 million in credit assurance—almost $30 million more than the $79.2 million in security Amendment No. 4 required.

**Tuesday, September 29, 2020**

22.     On Tuesday, September 29, Gulfport's CFO, Quentin Hicks, emailed Midship's Treasurer, Lisa Cohen: "Will you be executing the LC reduction amendments this morning?  We would like to get this reduced today if at all possible."   *See* Ex. K, Sept. 29, 2020 Email Chain at 9:01 AM Email from Q. Hicks to L. Cohen.  Mr. Manteris responded that afternoon: "Hi Quentin, our group is in all day budget meetings but Lisa and I would like to talk [to] you at 530 today.  Can you talk then?"   *Id.* at 11:07 AM Email from M. Manteris to Q. Hicks.  Mr. Hicks spoke with Mr. Manteris by phone later that day about the terms of the potential fifth amendment, and Mr. Manteris confirmed during that call that Midship would reduce the LC when Gulfport posted the Surety Bond.

**Wednesday, September 30, 2020**

23.     On Wednesday, September 30, Mr. Hicks emailed Mr. Manteris and Ms. Cohen at 8:29 AM: "As an update, we are working this morning to see if we can get a $34 MM surety in place today and then reduce the LC posting with you guys to $12,272,587 per the terms of the amended agreement.  We will keep you posted."   *See* Ex. L, Sept. 30, 2020 Email Chain at 8:29 AM Email from Q. Hicks to M. Manteris *et al*.  Mr. Manteris responded at 10:52 AM: "OK thanks Quentin keep us posted."   *Id.* at 10:52 AM Email from M. Manteris to Q. Hicks.

**Thursday, October 1, 2020**

24.     On Thursday, October 1, Gulfport obtained from Alliant Insurance Services ("Alliant") a draft Surety Bond, for which Alliant requested confirmation that the form was acceptable.  Ex. M, Oct. 1, 2020 Email from C. Payne (Alliant) to R. Addison (Gulfport).

**Friday, October 2, 2020**

25.     On Friday, October 2, at **10:26 AM**, without any warning or notice to Gulfport, Midship submitted a Form of Draw Certificate to Scotia Bank initiating a $75.6 million draw against the LC.  *See* Ex. N, Oct. 2, 2020 Draw Demand.  Midship "certifie[d]" to Scotia Bank in the Draw Demand that "[t]he amount demanded hereby represents funds due and owing by [Gulfport] and said amount has not been previously paid.  The amount demanded, hereby, when received, will be used to satisfy the funds due and owing by [Gulfport]."  *Id.*  That representation was false.  Gulfport did not owe Midship any funds at that time—much less the $75.6 million Midship requested in its Draw Demand.

26.     At **11:24 AM** that same day, Mr. Hicks emailed Mr. Manteris and Ms. Cohen: "Can we jump on a call asap today to discuss the Surety being posted (which will happen in next hour or so) and the reduction in the LC amount thereafter?  Would a call at noon central work?"  *See* Ex. O, Oct. 2, 2020 Email Chain at 11:24 AM Email from Q. Hicks to M. Manteris & L. Cohen.

27.     ***An hour and six minutes later***, at **12:30 PM**, Mr. Manteris sent an email to Pamela Hardebeck, copying Mr. Hicks, and attaching a formal letter "in reference to the Service Agreement and Precedent Agreement," which stated:  "Pursuant to Section 3(C)(vi)(b) of the Precedent Agreement, you were obligated to provide an irrevocable surety bond, in the form of Exhibit H to the Precedent Agreement, . . . in an amount equal to at least $34,000,000 . . . prior to Oct. 1, 2020.  You have failed to timely provide the Required Surety Bond and such failure has resulted in a breach . . . ."  *See* Ex. P, Oct. 2, 2020 Email from M. Manteris to P. Hardebeck.

13

28.     Mr. Hicks responded by email *two minutes later*: "Can we get on a call to discuss all this?"  *See* Ex. Q, Oct. 2, 2020 Email from Q. Hicks to M. Manteris & P. Hardebeck.  The parties convened a call 30 minutes later to discuss, during which the representatives from Gulfport asked the Midship executives to explain why Midship initiated a full draw on the LC when Gulfport had made the required Prepayment and—as the parties had discussed over the preceding five days—was prepared to send over a $34 million Surety Bond.  The total credit assurance in place at that point ($108.5 million) was more than the $79.2 million required under the Agreement.  The Midship executives affirmed that the reason they had drawn on the LC was because the Surety Bond had not been in place before October 1.  The Gulfport executives expressed their belief that Midship was acting in bad faith under the circumstances and asked that Midship immediately withdraw the Draw Demand.  Midship refused and then immediately used its new leverage to demand more advantageous terms in negotiating a potential fifth amendment to the Agreement, suggesting that the draw dispute could be resolved if Gulfport would agree to Midship's proposed terms.  Gulfport maintained its objection to the propriety of the Draw Demand.

29.     Gulfport's outside counsel sent a letter to Scotia Bank on October 2, alerting the bank that, contrary to the representations in Midship's Draw Demand, "[t]here has been no . . . default, and Gulfport hereby directs you not to make any distribution on account of the Letter of Credit until this dispute has been resolved."  *See* Ex. S, Oct. 2, 2020 Letter from S. Serajeddini to Scotia Bank.

30.     At **1:18 PM**, Mr. Hicks emailed Mr. Manteris and Ms. Cohen, reiterating that Gulfport had the Surety Bond ready to be provided to Midship, subject to clarification from Midship as to the corresponding reductions to the LC: "We have the surety bond ready to go, but want to have a better view of where we stand with you and your board/lenders on the [LC] funding

14

and [LC] reduction issues before we release it." *See* Ex. R, Oct. 2, 2020 Email Chain at 1:18 PM Email from Q. Hicks to M. Manteris & L. Cohen.

31. Mr. Manteris responded to Mr. Hicks at **3:03 PM**, requesting that Gulfport provide a copy of the unsigned Surety Bond. *Id.* at 3:03 PM Email from M. Manteris to Q. Hicks. Mr. Hicks emailed the unsigned $34 million Surety Bond to Mr. Manteris, copying Ms. Cohen, at **4:07 PM**. *Id.* at 4:07 PM Email from Q. Hicks to M. Manteris.

**Monday, October 5, 2020**

32. Mr. Manteris called Mr. Hicks late in the evening on October 5 to explain that he had been unable to convince Midship's lenders to back off the Draw Demand.

**Tuesday, October 6, 2020**

33. On Tuesday, October 6, Gulfport's outside counsel sent a letter to Midship stating that the draw against the LC violated the Agreement and reiterating Gulfport's request that Midship withdraw its Draw Demand immediately. *See* Ex. T, Oct. 6, 2020 Letter from D. Donovan to J. Stevens.

**Wednesday, October 7, 2020**

34. On Wednesday, October 7, at **11:38 AM**, Midship responded to the letter from Gulfport's outside counsel, asserting that Gulfport breached the Agreement by failing to deliver the Surety Bond before October 1, declining to waive the purported breach, and affirming its plan to draw down the $75.6 million LC in its entirety. *See* Ex. U, Oct. 7, 2020 Email from M. Manteris to P. Hardebeck. Midship further confirmed that it was "not accepting the surety bond provided by you on October 2, 2020 and has exercised its right under the Service Agreement and Precedent Agreement to draw the Letter of Credit in full." *Id.* Midship has never explained its rationale for contending that a slight delay in providing a Surety Bond when Midship was already secured in excess of the contract requirements by its preferred form of assurance in a letter of credit

constitutes *any amount owed* by Gulfport, much less how that could possibly be construed as "***an***

***amount equal to***" the $75.6 million Midship seized through its Draw Demand.

35.     Just *minutes after* Midship sent its letter asserting the technical breach as its basis

for drawing down on the LC, at **11:49 AM**, Mr. Manteris sent Mr. Hicks an email addressing the

parties' negotiations of a potential fifth amendment to the Agreement.  *See* Ex. V, Oct. 7, 2020

Email from M. Manteris to Q. Hicks.   Mr. Manteris wrote: "We appreciate the continued

conversation and look forward to additional discussions toward a mutually acceptable, potential

Amendment No. 5 that would provide Gulfport appropriate, agreed volume relief, has the full

support of Gulfport's bondholders, and is manageable and equitable for Midship given its financial

obligations."  *Id.*  Mr. Manteris's email continued:

> You will have seen that we recently sent the attached notice to Gulfport rejecting
> the late, unsigned (by Gulfport) surety bond that Gulfport sent to Midship on
> Friday, October 2.  The failure to deliver a surety bond on or by September 30 was
> a breach of the contract terms on file and approved by [FERC].  As we have
> discussed over the past few days, we find it unfortunate that this situation has
> presented itself, but the parties negotiated and expressly agreed specific
> requirements in Amendment No. 4 with specific consequences for breach.
> Accordingly, Midship is proceeding with the draw on the letter of credit.

*Id.*  The content of Midship's communications to Gulfport on October 7 and the sequence of events

make clear that Midship intended to use the draw as negotiation leverage.

36.     Scotia Bank executed on Midship's $75,600,000 Draw Demand in full on

October 7, disbursing the funds to Midship.

### 4.     Midship's Post-Draw Invoices to Gulfport

37.     Midship also demonstrated its overall strategy of extracting as much pre-petition

cash from Gulfport as it can, regardless of its basis for doing so, by issuing invoices to Gulfport

for September and October volumes that purported to allocate the amounts due for those months

between the $75.6 million in LC funds that Midship continues to improperly hold and the

16

$32.9 million Prepayment and also unilaterally and without explanation reverted to the Amendment No. 3 MDTQ volume amounts in calculating the amounts due.  Both of these actions served to effectuate a unilateral seizure of the Debtors' pre-petition cash by "crediting" these inflated amounts against the LC and/or the Prepayment funds held by Midship in order to attempt to convert those funds to Midship assets.

38.     Just in the last week, for example, on **November 5, 2020**, Midship invoiced Gulfport at the higher MDTQ levels that had been applicable under Amendment No. 3 (300,000 DTH), when the parties agreed in Amendment No. 4 that the MDTQ is reduced to 225,000 DTH.  *See* Ex. W, Nov. 5, 2020 Invoice at 5; *see also* Ex. X, Oct. 6, 2020 Invoice at 5. Because Midship invoiced 300,000 DTH instead of the contractually authorized 225,000 DTH (in the November 5 invoice), this would result in Midship improperly "crediting" itself $604,500 more from the Debtors' $32.9 million Prepayment than it is actually due under the terms of the operative Agreement.  This unilateral and unexplained departure by Midship from the parties' contractually agreed terms reflects a transparent and similarly improper attempt by Midship to seize additional Gulfport funds in anticipation of a chapter 11 filing.

39.     Midship's recent invoices also confirm that Midship did not credit the $75.6 million drawn from the LC against some amount owed by Gulfport at that time—because Gulfport did not owe Midship any amounts.  Rather, Midship acknowledges in its October 2020 invoice to Gulfport that it continues to hold those seized funds, stating that it "will apply $47,387.20 from the proceeds of Standby Letter of Credit No. 05854395NYA to satisfy" a portion of the October amounts due (with Gulfport's $32.9 million Prepayment having been applied to satisfy most of the amount invoiced).

17

40.     Gulfport, including its subsidiaries and affiliates (the Debtors), filed for chapter 11 bankruptcy on **November 13, 2020**.

**COUNT ONE: BREACH OF CONTRACT**

41.     Plaintiff incorporates all of the preceding allegations as if set forth herein.

42.     Midship breached the Agreement by drawing against the LC for more than an amount "equal to any and all money, obligations and/or liabilities due, owing or incurred," as required by Section III(1) of Amendment No. 4.  *See also* Ex. A § 3(C)(ii) ("Transporter shall not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the extent such draw is necessary to cover amounts that are due and owed by Shipper . . . and . . . have not been timely paid by Shipper . . . .").  Midship's breach damaged Gulfport in the amount of the $75,600,000 drawdown against the LC, in addition to the substantial resources Gulfport has been forced to expend in order to remedy Midship's improper actions.

43.     Midship's breach is ongoing, resulting to additional incremental harm to Gulfport each day that Midship refuses to relinquish the improperly converted LC funds.

44.     Gulfport is entitled to recover from Midship its actual damages, as well as applicable pre- and post-judgment interest.

**COUNT TWO: CONVERSION**

45.     Plaintiff incorporates all of the preceding allegations as if set forth herein.

46.     At all relevant times, the LC funds were property of the Debtors' estate and were to be held and controlled by Scotia Bank unless Midship drew down on the LC to cover amounts owed and unpaid by Gulfport.  Midship wrongfully exercised dominion or control over the LC funds, thereby causing injury to Gulfport in the amount of funds improperly drawn by Midship. Midship's conduct constitutes conversion of property of the Debtors' estate, and it was done with

18

malice that gives rise to exemplary damages.  Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001, 41.003.

47.     Plaintiff seeks to recover from Midship their actual damages, exemplary damages, and applicable pre-and post-judgment interest.

### COUNT THREE: FRAUD

48.     Plaintiff incorporates all of the preceding allegations as if set forth herein.

49.     Defendant represented to Plaintiff, in signing and agreeing to Amendment No. 4, that it would "not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the extent such draw is necessary to cover amounts that are due and owed by Shipper . . . and . . . have not been timely paid by Shipper."  *See* Ex. A § 3(C)(ii).

50.     Plaintiff relied on Defendant's contractual commitment to limit any draw against the Letter of Credit to amounts due and unpaid by Gulfport when it opened the LC in the amount of $75.6 million, also pursuant to the terms of the parties' Agreement.

51.     Contrary to Midship's representation that it would "not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the extent such draw is necessary to cover amounts that are due and owed by Shipper . . . and . . . have not been timely paid by Shipper," on October 2, 2020, Midship submitted a draw demand for the full amount of the LC.

52.     Not only did Midship falsely represent that it would only draw down on the LC if amounts were due and owed, but it also effectuated its draw on that LC on the basis of a false statement in its Draw Demand to Scotia Bank.  Midship "certifie[d]" in the Draw Demand that "[t]he amount demanded hereby represents funds due and owing by [Gulfport] and said amount has not been previously paid.  The amount demanded, hereby, when received, will be used to satisfy the funds due and owing by [Gulfport]."  *Id.*  But Gulfport did not owe Midship any funds at that time.

53.     Midship has not, and cannot, show that Gulfport owed Midship $75,600,000 on October 2, 2020, or at any other time.

54.      Plaintiff has been harmed to the extent of the funds improperly appropriated by Midship.

55.     Plaintiff seeks to recover from Midship their actual damages, exemplary damages, and applicable pre-and post-judgment interest.

## COUNT FOUR: NEGLIGENT MISREPRESENTATION

56.     Plaintiff incorporates all of the preceding allegations as if set forth herein.

57.     Defendant falsely represented to Scotia Bank in the October 2, 2020 Draw Demand that the demand "represents funds due and owing by [Gulfport] and said amount has not been previously paid.  The amount demanded hereby, when received, will be used to satisfy the funds due and owing by [Gulfport]."  Ex. N.

58.     Midship has not, and cannot, show that Gulfport owed Midship $75,600,000 on October 2, 2020, or at any other time.

59.     In providing the LC pursuant to the terms of the parties' Agreement, Gulfport justifiably relied upon Midship to ensure that any and all representations it made to Scotia Bank would be truthful.

60.     Midship's representation in its Draw Demand that Gulfport owed it $75,600,000 was material and false.  Plaintiff has been harmed to the extent of the funds improperly appropriated by Midship.

61.     Plaintiff seeks to recover from Midship their actual damages, exemplary damages, and applicable pre-and post-judgment interest.

## COUNT FIVE: TURNOVER OF PROPERTY TO THE ESTATE

### (11 U.S.C. § 542)

62.     Plaintiff incorporates all of the preceding allegations as if set forth herein.

63.     Midship's October 2, 2020 Draw Demand was far in excess of any amounts due and owed by Gulfport.  These excess proceeds remain property of Gulfport's estate under Section 541 of the Bankruptcy Code.  *In re TIC United Corp.*, No. 00-37234-BJH-7, 2008 WL 2437868 (Bankr. N.D. Tex. June 17, 2008).

64.      Midship has not shown, and cannot show, that Gulfport owed $75,600,000, either at the time of the Draw Demand or at any other time.

65.     Plaintiff seeks to recover these wrongfully drawn funds for the benefit of the estate.

## COUNT SIX: VIOLATION OF THE AUTOMATIC STAY

### (11 U.S.C. § 362)

66.     Midship is knowingly exercising control over and is impermissibly withholding estate property from the Debtors in the amount of $75,600,000.  Such acts amount to "self-help," intentional interference and/or willful ignorance and violate 11 U.S.C. §§ 362(a)(3), (a)(4), (a)(5) and/or (a)(6).  Midship's continuing exercise of control of the Debtors' property is intentionally taken with full knowledge of the existence of the pending bankruptcy cases.  Pursuant to 11 U.S.C. § 105, the Debtors are entitled to recover their actual damages equal to any diminution in the $75,600,000, plus interest and attorney's fees.

67.     In its latest invoices, Midship expressed its intention to "offset" portions of the $75,600,000 it converted against future invoices purportedly due under the Agreement.  Should Midship actually attempt to offset postpetition, such "offsets" are not only not permissible under the Agreement, but they are improper in this Circuit and would constitute an additional violation of the automatic stay.

## PRAYER FOR RELIEF

68.     WHEREFORE, by reason of the foregoing, Gulfport requests that the Court grant

the following relief:

a.  Entering a judgment that Midship breached Section III(1) of Amendment No. 4
    (amending Agreement § 3(C)(v)) by failing to limit its draw according to the
    requirements of the contract;

b.  Entering a judgment awarding both actual and exemplary damages: actual damages in
    the amount of $75,600,000, less any amounts equal to any and all money, obligations,
    and/or liabilities incurred by Gulfport and owed to Midship, punitive and exemplary
    damages in accordance with Tex. Civ. Prac. & Rem. Code Ann. § 41.003.

c.  Entering an order for any and all declaratory relief necessary and proper to enforce the
    parties' rights in relation to the aforementioned Agreement in the context of the pending
    chapter 11 proceedings.

Houston, Texas
November 16, 2020

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Richard A. Howell (TX Bar No. 24056674)
Veronica A. Polnick (TX Bar No. 24079148)
Cameron A. Secord (TX Bar No. 24093659)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                 rahowell@jw.com
                 vpolnick@jw.com
                 csecord@jw.com

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4600
Facsimile:      (212) 446-4800
Email:           edward.sassower@kirkland.com
                 steven.serajeddini@kirkland.com

-and-

Christopher S. Koenig (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           chris.koenig@kirkland.com

-and-

Daniel T. Donovan, P.C. (*pro hac vice* pending)
Bridget K. O'Connor, P.C. (*pro hac vice* pending)
Alexandra I. Russell (*pro hac vice* pending)
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:      (202) 389-5000
Facsimile:      (202) 389-5200
Email:           daniel.donovan@kirkland.com
                 bridget.oconnor@kirkland.com
                 alexandra.russell@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in
Possession*

### **Certificate of Service**

I certify that on November 16, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh