**CONFIDENTIAL**

**FINAL**

# PRECEDENT AGREEMENT

**By and Between**

**Midship Pipeline Company, LLC**

**and**

**Gulfport Energy Corporation**

**Dated:  March 15, 2017**

CONFIDENTIAL

FINAL

## PRECEDENT AGREEMENT

This Precedent Agreement (this "**Agreement**") is made and entered into as of March 15, 2017 ("**Effective Date**") by and between Midship Pipeline Company, LLC ("**Transporter**"), a Delaware limited liability company, and Gulfport Energy Corporation ("**Shipper**"), a Delaware Corporation.

WHEREAS, Transporter and Shipper may be referred to individually as a "**Party**" or collectively as the "**Parties**";

WHEREAS, Shipper, intending to commit to the Project as a Foundation Shipper (as such terms are defined herein), desires to have Transporter develop and construct the Project to provide natural gas transportation solution for its natural gas production from the SCOOP and STACK areas in order to access more desirable markets and is willing to enter into firm transportation commitments on the terms and conditions set forth herein to make it economically feasible for Transporter to commit to building the Project;

WHEREAS, Transporter is developing a natural gas transmission pipeline system (the "**Project**" as more fully described in Exhibit "G" attached hereto), which shall include facilities for the transportation of natural gas in interstate commerce from certain receipt points located in Oklahoma to certain delivery points in Oklahoma, Texas and/or Louisiana (collectively the "**Project Facilities**"), as such Project is more fully described in the Open Season terms and related materials;

WHEREAS, Transporter will hold an open season ("**Open Season**", and a draft copy of the Open Season terms in substantially the form to be used by Transporter to conduct the Open Season is attached as Exhibit F hereto) in connection with the Project to offer firm natural gas transportation service utilizing the capacity on the Project Facilities for up to a total of 1,400,000 dekatherms per day ("**Dth/day**") (such capacity, the **"Project Capacity"**);

WHEREAS, Shipper desires to obtain firm transportation service on the Project Capacity (the "**Firm Service**") in an amount up to the Transportation Quantity (as defined below in Section 1(G) of this Agreement) and become a "Foundation Shipper" on the Project with all of the benefits afforded to such status;

WHEREAS, Shipper acknowledges that the rendition by Transporter of the Firm Service as requested by Shipper will require Transporter to construct and/or acquire the Project Facilities;

WHEREAS, Shipper desires to obtain Firm Service in accordance with the terms and conditions hereof; and

WHEREAS, the Parties agree that the execution of this Agreement by Shipper shall constitute a qualifying bid in accordance with the terms of the Open Season.

1

**FINAL**

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, Transporter and Shipper agree as follows:

1.   **The Firm Service**

Subject to the satisfaction of the terms and conditions of this Agreement and any terms and conditions that may be imposed by the Federal Energy Regulatory Commission ("**Commission**" or "**FERC**"), Transporter shall construct and/or obtain the Project Facilities and render the Firm Service as follows:

A.   **Service Agreement**

Shipper, having committed to at least 175,000 Dth/day of Firm Service for the below defined Primary Term of ten (10) years, is agreed to be deemed to be a Foundation Shipper for all purposes under the Open Season and this Agreement, as well as the FTS Agreement and the Negotiated Rate Agreement, as both terms are defined herein below.

The Firm Service shall be provided pursuant to the terms of a gas transportation agreement (the "**FTS Agreement**") under Rate Schedule FTS of Transporter's FERC Gas Tariff (as such FERC Gas Tariff may be amended from time to time, the "**Tariff**") which FTS Agreement shall be in a form substantially similar to Exhibit A, and  in all material respects consistent with the terms of this Precedent Agreement.  The Firm Service shall also be provided pursuant to the terms of a negotiated rate firm transportation agreement ("**Negotiated Rate Agreement**") under which the transportation rates will remain in effect for a fixed contract term without regard to Transporter's maximum or minimum applicable Tariff rates; provided, however, at no time during the term of the FTS Agreement will Transporter, or its successors and assigns, propose any terms and conditions of service to any shipper which will have a material adverse impact on the Firm Service to be rendered to Shipper under the FTS Agreement.  The FTS Agreement and the Negotiated Rate Agreement shall be referred to collectively as the "**Service Agreement**."

B.   **Commencement Date**

Transporter shall provide Shipper written notice at least thirty (30) days in advance of the date on which Firm Service will commence under the FTS Agreement.  Unless Transporter and Shipper amend this Agreement to state otherwise, the Firm Service shall commence on the later of, subject to the last sentence of this Section 1(B): (i) April 1, 2019; or (ii) as applicable, either (a) the date on which the Project Facilities are placed in service, if such date is the first

2

day of the applicable calendar month, or (b) if the Project Facilities are placed in service on a day that is not the first day of the calendar month, the first day of the next calendar month ("**Commencement Date**"). For the avoidance of doubt, the Commencement Date hereunder shall not occur unless and until Transporter is able to provide Firm Service for Shipper's Transportation Quantity from each Primary Receipt Point to each Primary Delivery Point under Shipper's Service Agreement.

C.     **Primary Term; Extensions; Right of First Refusal**

   i.   The "**Primary Term**" of the Service Agreement shall commence on the Commencement Date and shall continue in full force and effect for a period of ten (10) years after the Commencement Date.

   ii.  Transporter hereby grants Shipper the right to negotiate an extension of the Primary Term during the last year of the Primary Term in accordance with this subsection.  Specifically, if Shipper desires to change or modify all or a portion of the Firm Service under the Service Agreement (e.g., rates, Term, TQ, receipt and delivery points), then at least nine (9) months prior to the expiration of the Primary Term, Shipper shall have the right to notify Transporter in writing of its intent to renegotiate the Service Agreement.  If Shipper elects to renegotiate the Service Agreement and notifies Transporter of same, then upon receipt of Shipper's notice, the Parties shall enter into a negotiation period of no greater than 90 days from Transporter's receipt of Shipper's notice. The Parties will use good faith efforts to negotiate an extension of Shipper's Service Agreement with the requested changes to the Firm Service for such extension.  If the Parties agree to extend the Primary Term and modify any other terms of the Firm Service under the Service Agreement, then the Parties will execute a replacement Service Agreement (including both the FTS Agreement and Negotiated Rate Agreement, as necessary) reflecting the modified terms thereto ("**Negotiated Service Agreement**"), and the prior Service Agreement shall, upon execution of the Negotiated Service Agreement, be of no further force or effect.

   iii. If the Parties fail to execute a Negotiated Service Agreement within the 90-day period described in Section 1(C)(ii) above or if Shipper elects not to renegotiate the Service Agreement, then Transporter hereby grants Shipper the right to renew the Service Agreement for up to five (5) additional years ("**First Renewal Term**"). If Shipper desires to extend the term of the Service Agreement for the First Renewal Term at the then current transportation rate(s), it shall notify Transporter in writing of its election at least six (6) months prior to the expiration of the Primary Term. Shipper's election notice shall specify the term of the First Renewal Term, the applicable TQ, and Primary Receipt Point(s) and Primary

3

Delivery Point(s). Should the Primary Receipt or Primary Delivery Points be different from Shipper's current Primary Receipt and Primary Delivery Points under the FTS Agreement, then such changes shall be submitted in accordance with Transporter's Tariff and will be subject to available capacity. The TQ on the First Renewal Term will be up to but no greater than the TQ at the time the renewal rights are exercised. The First Renewal Term may not be less than one (1) year. If Shipper declines to renew the Service Agreement for the First Renewal Term, then Transporter hereby grants Shipper those ROFR rights as described in Section 1(C)(v) below.

iv. If the Parties have executed either a (x) Service Agreement for the First Renewal Term pursuant to Section 1(C)(iii) above or (y) Negotiated Service Agreement pursuant to Section 1(C)(ii) above, then Transporter hereby grants Shipper the right to negotiate an extension of Shipper's Firm Service during the last year of the First Renewal Term or the last year of the Negotiated Service Agreement, as applicable, in accordance with the following terms.

(a) If Shipper has agreed to a Negotiated Service Agreement, and Shipper desires to negotiate an extension of the Firm Service under the same, including a change to all or a portion of the terms of such Firm Service (*e.g.*, rates, Term, TQ, receipt and delivery points), then at least nine (9) months prior to the expiration of the Negotiated Service Agreement, Shipper shall notify Transporter in writing of its intent to renegotiate the said agreement. Upon receipt of Shipper's notice, the Parties shall enter into a negotiation period of no greater than 90 days from Transporter's receipt of Shipper's notice. The Parties will use good faith efforts to negotiate an extension of the Negotiated Service Agreement with the requested changes to the Firm Service for such extension. If the Parties agree to so extend the term and modify any other terms of the Firm Service under the Negotiated Service Agreement, then the Parties will execute a replacement Negotiated Service Agreement (including both the FTS Agreement and Negotiated Rate Agreement, as necessary) reflecting the modified terms thereto, and the prior Negotiated Service Agreement shall, upon execution of the replacement Negotiated Service Agreement, be of no further force or effect. If Shipper declines to renew the Negotiated Service Agreement, then Transporter hereby grants Shipper those ROFR rights as described in Section 1(C)(v) below.

(b) If Shipper and Transporter agreed to a Negotiated Service Agreement in accordance with the above Section 1(C)(ii) or agreed to a First Renewal Term in accordance with the above Section 1(C)(iii), and the Parties fail to execute a replacement Negotiated Service Agreement within the ninety (90) day period described in Section 1(C)(iv)(a) above or if Shipper elects not to negotiate the Negotiated Service Agreement, and Shipper desires to extend the term of the

**FINAL**

Service Agreement for a second renewal term of up to five (5) additional years (the "**Second Renewal Term**", and each of the First Renewal Term and the Second Renewal Term, the "**Renewal Terms**") at the then current transportation rate(s), it shall notify Transporter in writing of its election at least six (6) months prior to the expiration of the First Renewal Term.  Shipper's election notice shall specify the term of the Second Renewal Term, the applicable TQ, and Primary Receipt Point(s) and Primary Delivery Point(s). Should the Primary Receipt or Primary Delivery Points be different from Shipper's current Primary Receipt and Primary Delivery Points under the FTS Agreement, then such changes shall be submitted in accordance with Transporter's Tariff and will be subject to available capacity. The TQ on the Second Renewal Term will be up to but no greater than the TQ at the time the renewal rights are exercised. The Second Renewal Term may not be less than one (1) year. If Shipper declines to renew the Service Agreement for the Second Renewal Term, then Transporter hereby grants Shipper those ROFR rights as described in Section 1(C)(v) below.

v. Transporter hereby grants Shipper a contractual right of first refusal ("**ROFR**") upon the expiration of the Primary Term, including any extension thereof in accordance with this Section 1(C).  For the sake of clarity, the ROFR granted by Transporter to Shipper hereunder consists of the rights set forth in the General Terms and Conditions of Transporter's Tariff in the relevant section regarding "Right of First Refusal" as the same is approved and in effect during the Term, and shall apply to Shipper notwithstanding the fact that Shipper will not pay maximum tariff rates under the Service Agreement.

vi. The Primary Term, First Renewal Term (if applicable), Second Renewal Term (if applicable), and any extension pursuant to any applicable ROFR shall collectively be referred to herein as the "**Term**."

**D.      Firm Service Rate**

i.      <u>Rate Election</u>.

Upon execution of this Agreement, Shipper must select one of the following rate options (indicated by an "X" in the space provided):



<u>X</u>            Shipper selects for the Primary Term of the FTS Agreement the fixed negotiated rate for the Firm Service as reflected below and to be reflected in the final Negotiated Rate Agreement, the form of which is attached as Exhibit B hereto.

_____            Shipper selects for the Primary Term of the FTS Agreement the recourse rate for the Firm Service, which shall be the

**FINAL**

applicable reservation and commodity rates, and any other applicable charges and surcharges set forth in Transporter's Tariff.

ii.    <u>Applicable Rate</u>.

The Negotiated Rate Agreement shall specify a negotiated reservation charge of $0.35 Dth/day, as the same may be adjusted from time to time hereunder and under the Negotiated Rate Agreement, (the "**Negotiated Reservation Charge**").   The Negotiated Rate Agreement shall also provide that in the event that the total aggregate volume reflected in all shippers' firm service commitments to the Project at the time of the Commencement Date equals or exceeds 1,000,000 Dth/day, the Negotiated Reservation Charge will be decreased by $0.01.

To the extent Transporter's fuel retainage percentage exceeds 0.8% in a given calendar year during the Term,  the Negotiated Rate Agreement shall provide for an adjustment to the Negotiated Reservation Charge for the next following calendar year by an appropriate percentage to compensate Shipper for the fuel retainage obligation above the threshold set forth in this sentence, based on the average Monthly Bidweek Spot Gas Prices for Oneok, Okla. under the heading "Midcontinent" as published by Platts Inside FERC Gas Market Report for such prior year.  In the event said index is discontinued, the Parties shall agree upon a replacement index.   The Negotiated Reservation Charge shall apply to Shipper's deliveries to secondary delivery points on the Project, made in accordance with the applicable provisions of the Tariff.

iii.    <u>Negotiated Rate Adjustment for Overrun Volumes</u>.

The final Negotiated Rate Agreement shall provide for an adjustment to the Negotiated Reservation Charge in accordance with this Section. Specifically, in the event that:

    (a) in one or more calendar year(s) during the Term (other than either of the last two years thereof regardless of any subsequent extension), Shipper transports aggregate volumes on the Project from any receipt point to any delivery point in excess of the TQ multiplied by the number of days in the relevant calendar year, (such amount for a given calendar year, an "**Annual Overrun Quantity**"), and

    (b) in any other calendar year during the Term (other than the last year thereof regardless of any subsequent extension) that follows a

year in which there was an Annual Overrun Quantity amount available, Shipper transports aggregate volumes on the Project from any receipt point to any delivery point less than the TQ multiplied by the number of days in the relevant calendar year (such amount for a given calendar year, an "**Annual Underrun Quantity**"), then

(c) during the year of the Term that immediately follows the year of the Annual Underrun Quantity, the Negotiated Reservation Charge shall be reduced by an appropriate percentage that results in a reduction to the aggregate reservation charges paid by Shipper during such year for the TQ multiplied by the number of days in that year that is consistent with the following sentence. The reduction in Shipper's aggregate reservation charges for the TQ in the year following the year in which there has been an Annual Underrun Quantity shall be the lesser of: (x) the product of the Annual Underrun Quantity multiplied by the unrevised Negotiated Reservation Charge, and (y) the product of the aggregate of the accumulated Annual Overrun Quantity multiplied by the unrevised Negotiated Reservation Charge. To the extent that after such determination there remains any Annual Overrun Quantity, such balance shall be carried forward to be applied the next time that there is an Annual Underrun Quantity, together with any additional Annual Overrun Quantity that may have arisen prior to such time.

**E.    Most Favored Nations**

If, any time and from time to time during the first five (5) years of the Primary Term of the Service Agreement, Transporter agrees to provide any shipper a rate or rates for firm or interruptible transportation service utilizing some or all of the Project Facilities in the applicable rate zone(s) in which Shipper's Primary Receipt Point(s) and Primary Delivery Point(s) are located (other than a negotiated rate for another Foundation Shipper that is the result of a temporary rate adjustment to account for an Annual Overrun credit in accordance with such Foundation Shipper's negotiated rate agreement) and such third party rate is less than the Negotiated Reservation Charge, then Transporter will (x) immediately notify Shipper in writing of such agreement, (y) provide Shipper with the negotiated rate terms agreed to with the third party shipper within 5 business days following the execution thereof in order for Shipper to verify whether Shipper's rights are trigger by such agreement, and (z) offer Shipper the same lower rate or rates as of the date that Transporter begins providing the lower rate

or rates to the other shipper for the same term that Transporter has agreed to provide to the other shipper but not to exceed the Primary Term of the Service Agreement.  This most favored nations provision shall apply regardless of: (i) the type of rate or rates offered to the other shipper (e.g., negotiated rate, discounted rate, firm service rate, interruptible service rate, recourse rate, or otherwise); (ii) the classification of the other shipper offered the lower rate or rates (e.g., Foundation Shipper, Open Season shipper, or otherwise); (iii) whether the receipt point(s) or the delivery point(s) for the other shipper are the same as those listed in Shipper's Service Agreement or are located anywhere else on the Facilities within the applicable rate zone(s) as set forth above; (iv) the duration of the contracted primary term for the other shipper; or (v) the maximum daily quantity the other shipper has committed to on the Facilities or any expansion thereof.  If Shipper is willing to accept the offer of the revised rate or rates (including any rate related formula) as the other shipper (without regard to, and without altering, the firm character of Shipper's service), then Shipper shall notify Transporter within ten (10) business days of Shipper's receipt of such offer, and the Parties will enter into an amendment to this Agreement and/or the Service Agreement, as applicable, at the lower rate or rates.

F.    **Future Expansions**

Should Transporter elect in the future to expand the Project Facilities for mainline service on a forward haul basis at any time prior to the date that is four (4) years from and after the Commencement Date, Shipper shall have a right to participate in that expansion project as set forth herein (such project, an "**Expansion Project**").  Transporter shall notify Shipper prior to holding an open season for an Expansion Project and, in consideration of Shipper's commitment hereunder, Shipper shall have the right to participate in such Expansion Project with the lowest rate applicable to shippers thereunder, and the right to receive any benefits that attach to shippers committing to service on such Expansion Project, provided that Shipper subscribes to at least 25,000 Dth/day in that Expansion Project, subject however in all cases to applicable legal and regulatory requirements. Nothing in this Section 1(F) shall require or otherwise create an obligation for Transporter to expand or enlarge the Project Facilities.

G.    **Transportation Quantity**

i.     Transporter shall transport and deliver for Shipper on a firm basis up to 200,000 Dth/day ("**Transportation Quantity**" or "**TQ**"), from the Primary Receipt Point(s) identified in Section 1(H) to the Primary Delivery Point(s) identified in Section 1(I)) (for the avoidance of doubt, up to the full TQ at each individual Primary Receipt Point and Primary

**FINAL**

Delivery Point; provided, however, that subject to the Tariff, on any given day neither the combined receipts to the Primary Receipt Point(s) nor the combined deliveries to the Primary Delivery Point(s) shall exceed the TQ). The maximum allowable operating pressure for the Project, to be reflected in the Tariff, shall be 1,440 psig.

ii.      Transporter shall commence early deliveries of up to the TQ from the Primary Receipt Points to the Primary Delivery Point at Bennington (as set forth below) to the extent the facilities necessary to effect such deliveries are available prior to the Commencement Date. Such pre-Commencement Date transportation service shall be on an interruptible basis (subject to an interruptible service agreement in the form set forth in the Tariff) and the rate for such service for Shipper and other Foundation Shippers only shall be a negotiated rate of $0.15 per Dth/day.  The receipt point for such interruptible service shall be the Primary Receipt Point(s) set forth in Section 1(H) below, and the delivery point shall be any available delivery point on the Project Facilities.  Such service, to the extent it is available, shall be provided under a service agreement and negotiated rate agreement to be executed by Transporter and Shipper which shall have a term ending on or prior to the Commencement Date.

iii.      Commencing on the date on which Transporter accepts a FERC Certificate (as defined in Section 4(B)(i) below) for the Project and continuing until sixty (60) days prior to the Commencement Date, Shipper shall have the right, by written notice to Transporter, to increase its TQ by up to 100,000 Dth/d for the Primary Term, subject to capacity availability as further provided in the next sentence.  If Shipper exercises this right it has under this Section 1(G)(iii) and Transporter determines that there is available capacity sufficient to grant the request in accordance with the terms of the Tariff (whether for the full amount requested by Shipper or some lesser amount in the event that there are more requested increases in quantity than Transporter can accommodate, in which case the requesting parties' requests for an increase in their respective TQ shall be prorated based on the percentage of the amount requested by each shipper over the total amount of increase requested by all requesting shippers), and the Parties have executed the Service Agreement, then Transporter and Shipper agree that they shall, prior to the Commencement Date, execute a replacement Service Agreement (including for the avoidance of doubt both the FTS Agreement and the Negotiated Rate Agreement, to the extent necessary) reflecting the adjusted TQ, and the prior Service Agreement shall upon

**FINAL**

such execution be of no further force or effect.  In the event that the exercise of such right to increase the TQ by Shipper or other shippers, either individually or in the aggregate, triggers a rate reduction as set forth in Section 1(D)(ii), then the other shippers that qualify as a Foundation Shipper will similarly have the right to enter into a new Service Agreement to reflect the applicable decrease in the Negotiated Reservation Charge.

iv.      Notwithstanding anything set forth herein to the contrary, prior to the Commencement Date, Shipper may not transfer, release to another unaffiliated shipper, or assign, or convey all or any portion of its TQ to another unaffiliated shipper, unless the total subscribed capacity on the Project Facilities is equal to or greater than 1,000,000 Dth/day of Firm Service on a collective basis, and in such case any such assignment shall be subject to Section 8 hereof; nor shall Shipper reduce its subscribed capacity prior to the Commencement Date, to the extent it may otherwise do so in accordance with the terms of this Agreement, if the total subscribed capacity on the Project Facilities, after any such reduction, would be less than 1,000,000 Dth/day of Firm Service on a collective basis; provided, however, that Shipper may transfer, release, assign, or convey all or any portion of its TQ prior to the Commencement Date if that shipper sells or transfers substantially all of its assets, or if the transfer, assignment, release or conveyance is in connection with the sale or transfer by Shipper of the producing properties associated with such capacity, as provided in Section 8.  Shipper may, within one hundred twenty (120) days of the Effective Date, elect to reduce its TQ by up to 50,000 Dth/day, only to the extent that such reduction would not cause the total aggregate firm transportation service commitments to the Project to be less than 1,000,000 Dth/day.

v.      Following such one hundred twenty day period referred to in subsection (iv) above, and at any time and from time to time thereafter until the date that is thirty (30) days' prior to the Commencement Date ("Extended Period"), Shipper may elect to reduce its TQ by up to 50,000 Dth/day, but only to the extent that such reduction is offset by additional shipper volume commitments to the Project during the Extended Period, such that the total aggregate shipper firm service commitments to the Project are not reduced below the aggregate commitments that existed prior to Shipper's reduction and prior to the addition of such additional shipper(s)' volume commitment(s).  If additional shipper commitments occur during the

10

**FINAL**

Extended Period, then Transporter shall provide Shipper and the other Foundation Shippers with written notice within five (5) business days of each such additional shipper commitment to the Project.  Within ten (10) business days of the notice in the previous sentence, Shipper shall provide written notice to Transporter of its election to make a reduction, and the amount of such reduction. If Shipper elects to reduce its TQ and no other Foundation Shipper elects to reduce its TQ, then Shipper may reduce its TQ in the amount so elected subject to the provision set forth herein. If a reduction is elected by both Shipper and one or more other electing Foundation Shippers, then such reductions between Shipper and the other electing Foundation Shippers shall be subject to allocation on a pro rata basis by Transporter based on the amount of the new shipper volume commitment(s).

**H.      Primary Receipt Point(s)**

The Primary Receipt Point quantities shall be as follows:

| **Receipt Point** | **County** | **ST** | **Maximum Receipt Quantity** |
|---|---|---|---|
| WEX Grady | Grady | OK | 200,000 Dth/d |
| Bidirectional meter to be determined prior to execution of Service Agreement by mutual agreement of Shipper and Transporter with Enable Gas Transmission, Enable Oklahoma Intrastate Transmission, or Oklahoma Gas Transmission in STACK area | Kingfisher, Canadian, or Grady | OK | 200,000 Dth/d |

11

I.      **Primary Delivery Point(s)**

The Primary Delivery Point quantities shall be as follows:

| **Delivery Point** | **County/Parish** | **ST** | **Maximum Delivery Quantity** |
|---|---|---|---|
| MEP Bennington | Bryan | OK | 200,000 Dth/d |
| Gulf Crossing Bennington | Bryan | OK | 200,000 Dth/d |
| NGPL 801 | Carter | OK | 100,000 Dth/d |
| NGPL Bennington | Bryan | OK | 100,000 Dth/d |

**J.  Additional Receipt/Delivery Points**

Shipper may request in writing that Transporter add new receipt and/or delivery points to be considered as Primary Receipt Point(s) or Primary Delivery Point(s) (as the case may be) provided that any such points are located on the Project as described and approved in the FERC Certificate, and Transporter shall use Commercially Reasonable Efforts to accommodate any such requests subject to applicable regulatory requirements and approvals and to the applicable provisions of the Tariff from and after the Commencement Date, provided that the establishment of such receipt and/or delivery points does not materially interfere with the operations of the Project Facilities; provided further, that such requesting Shipper(s) reimburses Transporter for the actual cost of the facilities necessary to establish such receipt and/or delivery points, plus a tax gross up for such facilities' costs, to the extent appropriate, to be reasonably agreed upon by the Parties, which reimbursement shall be on a pro-rata basis if and to the extent that such facilities would include the primary receipt or primary delivery point of any other firm shipper(s) on the Project, which other firm shipper(s) provide their pro rata share of such costs.  Except for such reimbursement of the actual cost of the facilities necessary to establish such receipt and/or delivery points, the addition of one or more receipt and/or delivery points hereunder shall not result in any increase to any rate, fee, charge or any other amount paid or to be paid by Shipper hereunder.

**K.  Gas Quality Specifications**

In order to avoid any gas interchangeability issues with interconnecting downstream natural gas pipelines, Transporter shall include in its pro forma Tariff a complete set of

FINAL

gas quality specifications that will meet the most stringent gas quality specifications of all interconnecting downstream natural pipelines at the time of the filing of the Certificate Application.  If, at any time and from time to time during the Term, a certain gas quality specification in the Tariff does not meet the corresponding gas specification in an interconnecting downstream pipeline, then Transporter, at its sole cost and expense, shall use Commercially Reasonably Efforts to seek and obtain from such interconnecting pipeline a waiver of the gas quality specification at issue, and if  a waiver cannot be obtained, to adjust its own gas quality specifications to match the downstream pipeline, in either case, for the Term.  Transporter shall provide Shipper with at least ninety (90) days advance notice of any change to the gas quality specifications being made or proposed by an interconnecting downstream pipeline, as well as Transporter's own gas quality specifications in the event that it was unable to secure the waiver from the interconnecting pipeline. In addition, Transporter shall keep Shipper advised of all efforts to secure a waiver to such change by the interconnecting pipeline.  Transporter shall use Commercially Reasonable Efforts (as defined in Section 9(M) below) to ensure that any such waiver it obtains remains in effect for the remainder of the Term.

**2.**     **The Open Season**

Execution of this Agreement by Transporter shall be deemed to be an award of the TQ in Section 1(G) to Shipper without proration subject to the terms of the Open Season and this Section 2(A).  Transporter reserves the right, but shall not be required, to conduct additional open season(s) to market unsubscribed capacity on the Project Facilities. Notwithstanding anything to the contrary herein and subject to the other applicable provisions of this Agreement and Shipper's rights to terminate this Agreement, Transporter shall not be in breach of its obligations under this Agreement if Shipper's TQ or rights as a Foundation Shipper are required to be adjusted or modified by Transporter in order to comply with any applicable order of the Commission; provided further that in the event that Transporter is required to prorate the award of available Project Capacity as a result of the Open Season, available Project Capacity will be reduced first for all shippers that do not qualify as Foundation Shippers, and then finally for Foundation Shippers.  In such event, available Project Capacity will be reduced among shippers in the same category of shipper based upon the highest net present value of each prospective shipper's binding firm transportation commitment, as reasonably determined by Transporter.

**3.**     **Shipper Obligations**

**A.**     **Shipper Internal Approvals**

Shipper shall use Commercially Reasonable Efforts to obtain all approvals from its executive management and/or board of directors necessary for the

consummation of all of the agreements contemplated by this Agreement ("**Shipper Internal Approvals**") by no later than the date that is thirty (30) calendar days following the Effective Date. Shipper shall promptly provide written notice to Transporter that Shipper has received all Shipper Internal Approvals.

**B.     Support for Transporter's Regulatory Filings**

Subject to Transporter's satisfaction of the requirements set forth in Sections 4(B)(iii) and 4(C) below, Shipper agrees that it will not oppose Transporter's Certificate Application and Transporter's filing of Shipper's Negotiated Rate Agreement (subject to the proviso at the end of this section), and upon Transporter's reasonable request in writing at least seven (7) business days before any applicable deadline for comment or interventions, Shipper will use Commercially Reasonable Efforts to intervene and file comments in support of Transporter's Certificate Application and Transporter's filing of Shipper's Negotiated Rate Agreement, provided such application(s) and filing(s) by Transporter are materially consistent with this Agreement, the Negotiated Rate Agreement, and the draft Certificate Application and pro forma Tariff reviewed by Shipper pursuant to Section 4(C); and provided further that nothing herein shall preclude Shipper from addressing any matter raised by Shipper as provided in Section 4(C) and not resolved to Shipper's reasonable satisfaction.

**C.     Shipper's Creditworthiness**

As a condition of Transporter's execution of this Agreement, the Service Agreement and any other related agreements, Shipper shall satisfy the following credit assurance provisions as of the Effective Date of this Agreement, and shall have a continuing obligation to satisfy the credit assurance provisions of this Agreement throughout the term of this Agreement, the Service Agreement and any other related agreements as may be in effect from time to time.

i.     Creditworthiness Defined

Shipper shall at all times from the Effective Date be creditworthy, or provide the credit assurance contemplated herein. Shipper shall be deemed "**creditworthy**" if it has and maintains a long-term senior unsecured debt rating from either (1) Moody's Investors Service, Inc. or an applicable successor agency ("Moody's") of Baa3 or higher or (2) Standard & Poor's or an applicable successor agency ("S&P") of BBB- or higher. Alternatively, Shipper may be accepted as creditworthy by Transporter if Transporter determines that, notwithstanding the failure to meet or maintain the rating requirements in this Section 3(C)(i), the

**FINAL**

financial position of Shipper (or an entity that guarantees all of Shipper's payment obligations) is and remains reasonably acceptable to Transporter during the term of this Agreement and the Service Agreement.

ii.    <u>Credit Assurances</u>

Beginning on the Effective Date, if at any time Shipper is not creditworthy pursuant to Section 3(C)(i) of this Agreement, then, Transporter shall have the right to demand that Shipper provide, and Shipper shall provide, credit assurance within ten (10) business days after receipt of written notice from Transporter, in the form of and at Shipper's option: (i) an irrevocable standby letter of credit, in a form substantially similar to Exhibit D ("**<u>Letter of Credit</u>**"), from a Qualified Institution (as defined below);  (ii) a guaranty ("**<u>Guaranty</u>**") substantially in the form of Exhibit C from an entity that is creditworthy under the standards applicable to Shipper as set forth in Section 3(C)(i) above; (iii) a cash security deposit to be placed in a third party escrow account ("**<u>Deposit</u>**") pursuant to a form of escrow agreement to be negotiated in good faith and executed and delivered by the parties and the relevant third party escrow agent; or (iv) a mutually agreeable alternative form of credit assurance.  In the event that Shipper provides credit assurance in the form of either a Letter of Credit or a Deposit, the amount of such Letter of Credit or Deposit shall be equal to the following, as the case may be: (1) prior to the Commencement Date, the number of months of reservation charges under the Service Agreement based on Shipper's TQ as set forth herein as shown in the table immediately below this subsection; (2) at any time following the Commencement Date during the Primary Term, the lowest of (a) twenty-four months of reservation charges under the Service Agreement based on Shipper's TQ as set forth herein, or (b) of the number of months of reservation charges for the remaining months of the Primary Term; or (3) at any time during a Renewal Term or an extension to the Term, ninety (90) days of reservation charges under the Service Agreement based on Shipper's TQ.  The term "**<u>Qualified Institution</u>**" shall mean a major U.S. commercial bank, or the U.S. branch offices of a foreign bank, which has assets of at least $10 billion dollars and a credit rating of at least "A-" by S&P, or "A3" by Moody's.  If a Guaranty is provided, the Guaranty shall guarantee all payment obligations of Shipper under this Agreement and the Service Agreement.  Transporter shall not make a claim against a Guaranty or draw against a Letter of Credit or Deposit except to the extent such draw is necessary to cover amounts that are due and owed by Shipper in accordance with the applicable provisions of this Agreement, the Tariff

15

and/or under the Service Agreement, as applicable, and which amounts have not been timely paid by Shipper in accordance with the terms hereof or under the Service Agreement, as applicable.

| Quarter Ending | 3/31/17 | 6/30/17 | 9/30/17 | 12/31/17 | 3/31/18 | 6/30/18 | 9/30/18 | 12/31/18 | 3/31/19 | 6/30/19 |
|---|---|---|---|---|---|---|---|---|---|---|
| # of months of reservation charges | 1.4 | 1.9 | 4.2 | 5.1 | 6.8 | 20.6 | 24.0 | 24.0 | 24.0 | 24.0 |

iii.   <u>Credit Assurance Effectiveness</u>

Any credit assurance to be provided to Transporter pursuant to Section 3(C)(ii) shall continue in effect until (i) Shipper is deemed creditworthy as defined in Section 3(C)(i) of this Agreement; (ii) the execution of a credit agreement to replace this provision; (iii) the provision of another form of credit assurance, as provided in Section 3(C)(ii); (iv) this Agreement is terminated by either Party as provided for herein prior to the execution of the Service Agreement, or (v) the end of the Term, and in the case of any termination, full payment of all outstanding balances and charges has been made.

iv.   <u>Failure to Provide Credit Assurance</u>

The failure of Shipper to timely satisfy or maintain the creditworthiness or credit assurance requirements set forth in this Section 3(C) shall in no way relieve Shipper of any or all of its other obligations under this Agreement and the Service Agreement, nor shall it affect Transporter's right to seek damages or performance hereunder or thereunder.  Further, if prior to the Commencement Date, Shipper fails to timely satisfy and maintain the requirements of this Section 3(C), then Transporter may give written notice to Shipper of such failure, and if such failure has not been cured within fifteen (15) days, then Transporter may terminate this Agreement and if applicable the Service Agreement.

**FINAL**

**4.**    **Transporter Obligations**

**A.**    **Transporter Shipper Internal Approvals**

Transporter shall use Commercially Reasonable Efforts to obtain all approvals from its executive management and/or board of directors necessary for the consummation of all of the agreements contemplated by this Agreement ("**Transporter Internal Approvals**") by no later than thirty (30) calendar days following the Effective Date. Once Transporter has received all Transporter Internal Approvals, it shall promptly notify Shipper in writing of same.

**B.**    **Transporter Regulatory Authorizations**

i.    Obligation to Seek Transporter Regulatory Authorizations

Transporter shall use Commercially Reasonable Efforts to obtain all necessary and final authorizations, consents and approvals, including all necessary and final authorizations from federal, state and local authorities having jurisdiction, including those of the Commission, including without limitation any applicable certificate(s) of public convenience and necessity ("**FERC Certificate**"), and of any state or federal court in which Transporter seeks to exercise eminent domain or otherwise obtain rights or access to land (collectively, all such foregoing approvals are referred to herein as "**Transporter Regulatory Authorizations**"), on terms and conditions acceptable to Transporter in its reasonable discretion, to install, construct, acquire and/or secure the Project Facilities and to render the proposed Firm Service pursuant to the terms and conditions specified herein.  For illustrative purposes, certain specific milestones for the various steps involved in obtaining such Transporter Regulatory Authorizations are listed on Exhibit E, provided that the dates on Exhibit E are non-binding.

ii.    Right to Seek Rehearing, Appeal, or Judicial Review

Nothing contained herein shall prevent Transporter from filing, amending, or prosecuting applications for any Transporter Regulatory Authorizations that it requires hereunder or seeking rehearing, appeal, or judicial review of any unfavorable term or condition contained in any Transporter Regulatory Authorization, including the FERC Certificate.

iii.    Obligation to Provide Notice of Filings

Except to the extent a different notice requirement is prescribed elsewhere in this Agreement, Transporter shall provide written notice to Shipper at

**FINAL**

least seven (7) business days in advance of any filing for a Transporter Regulatory Authorization for which Transporter will seek Shipper's support pursuant to Section 3(B) of this Agreement, together with a draft copy of the filing, and a copy of the filing when made marked to show changes from the draft.

**C.      Obligation to Provide Shipper Opportunity to Review Certificate Application**

Transporter will furnish Shipper with a draft copy of the FERC Certificate application text and the public exhibits, including the pro forma Tariff, but not including the environmental resource reports or any non-public or critical energy infrastructure information ("**CEII**") exhibits ("**Certificate Application**") no less than twenty (20) business days prior to the date Transporter intends to file such Certificate Application to ensure said draft Certificate Application is materially consistent with this Agreement, the Service Agreement, and the pro forma Tariff. The pro forma Tariff shall include, among other things, gas quality specifications that will meet the most stringent gas quality specifications of all interconnecting natural gas pipelines and minimum receipt and delivery pressures that will allow Transporter to receive and redeliver Shipper's gas into interconnecting natural gas pipelines in accordance with the terms and conditions hereunder. Shipper will notify Transporter within ten (10) business days after the date of receipt of such draft Certificate Application whether Shipper has any material objections to such draft Certificate Application, in which case Shipper shall describe the specific objectionable language.  Transporter shall consider any such objections and, in its reasonable judgment, may revise such draft Certificate Application to address the Shipper's objection(s).  On or before the date of filing, Transporter shall provide Shipper with a copy of the Certificate Application marked to show all changes from the draft previously provided to Shipper.  Transporter shall not make any material changes to the Certificate Application thereafter without prior notice to Shipper.

**D.      Modification Based on Transporter Regulatory Authorizations**

In the event that FERC rejects or denies the application for the FERC Certificate in its entirety as filed by Transporter, Shipper may give written notice of termination of this Agreement to Transporter within fifteen (15) days of the rejection or denial of the FERC Certificate.  During the ninety (90) day period following the issuance of such notice, the Parties shall negotiate in good faith in an attempt to reach agreement regarding a means to preserve the economic bargain set forth in this Agreement.  If such agreement cannot be achieved in ninety (90) day period following the issuance of such notice, this Agreement shall terminate without either Party having any liability to the other Party on the

**FINAL**

ninetieth (90th) day following issuance of the notice of termination by Shipper, unless prior to such date: (1) the Parties otherwise mutually agree in writing to an amendment to this Agreement or Service Agreement; (2) the Parties mutually agree in writing to extend the negotiation period; or (3) Shipper withdraws its previously submitted notice to terminate.

**5.**     **Conditions Precedent, Termination, and Damages**

    **A.**     **Transporter Conditions Precedent**

Notwithstanding anything else in this Agreement to the contrary, Transporter's obligation to construct, own, operate and/or acquire the Project Facilities, to execute the Service Agreement, and to render the Firm Service contemplated hereunder is subject to the fulfillment or waiver by Transporter of each of the following conditions precedent (each a "**Transporter Condition Precedent**" and collectively the "**Transporter Conditions Precedent**"):

    i.    Shipper Internal Approvals

Shipper shall provide written notice to Transporter on or before the date that is thirty (30) calendar days following the Effective Date that Shipper has obtained all Shipper Internal Approvals necessary for the consummation of all agreements contemplated hereby.

If this Transporter Condition Precedent has not been satisfied or waived in writing by Transporter by the date referred to in the previous sentence, then, subject to Section 5(C), Transporter shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Shipper; provided, however, that any such notice of termination must be provided within thirty (30) days after the event giving rise to Transporter's right to terminate hereunder.

    ii.    Failure to Receive Notice of Internal Approvals from all Foundation Shippers

Transporter shall have received written notice from Foundation Shippers unaffiliated with Transporter whose Project commitments total at least 750,000 Dth/d of each such Foundation Shipper's receipt of all required internal approvals pursuant to its precedent agreement with Transporter no later than thirty (30) days after the execution of the latest of the relevant executed Foundation Shipper precedent agreements.   Notwithstanding Section 5(C), Transporter shall promptly advise Shipper of the

satisfaction, waiver, or failure of this Condition Precedent following the deadline set forth above.

If this Transporter Condition Precedent has not been satisfied or waived in writing by Transporter, then, subject to Section 5(C), Transporter shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Shipper; provided, however, that any such notice of termination must be provided within thirty (30) days after the event giving rise to Transporter's right to terminate hereunder.

iii.  <u>Failure to Obtain Transporter Regulatory Authorizations or other Regulatory Authorizations</u>

All Transporter Regulatory Authorizations necessary to construct and/or acquire and secure the Project Facilities and to render the proposed Firm Service pursuant to the terms and conditions specified herein (not including related to the filing of the Negotiated Rate Agreement terms) have been received by Transporter by no later than July 1, 2019, and each shall be satisfactory to Transporter, in Transporter's reasonable discretion.

If this Transporter Condition Precedent has not been satisfied or waived in writing by Transporter, then, subject to Section 5(C), Transporter shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Shipper; provided, however, that any such notice of termination must be provided within thirty (30) days after the event giving rise to Transporter's right to terminate hereunder.

iv.  <u>Shipper Execution of the Service Agreement</u>

Shipper has executed the Service Agreement as required by Section 6(B) of this Agreement.

If Transporter has tendered the Service Agreement to Shipper as required by Section 6(A) but Shipper has not executed same, and this Transporter Condition Precedent has not been satisfied or waived in writing by Transporter, then Transporter, subject to Section 5(C), shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without liability to Shipper by giving written notice to Shipper at any time after the date by which Shipper is required to execute the Service Agreement pursuant to Section 6(B) of this Agreement, but prior to Shipper's execution of the Service Agreement.

**FINAL**

v.      Transporter Internal Approvals

On or before thirty (30) calendar days following the Effective Date, Transporter shall have obtained all Transporter Internal Approvals necessary for the consummation of all agreements contemplated by this Agreement and the construction and/or acquisition of the Project Facilities subject to the terms and conditions of this Agreement.

If this Transporter Condition Precedent has not been satisfied or waived in writing by thirty (30) calendar days following the Effective Date, then, subject to Section 5(C), Transporter shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Shipper; provided, however, that any such notice of termination must be provided within thirty (30) days of the event giving rise to Transporter's right to terminate hereunder.

**B.      Shipper Conditions Precedent**

Notwithstanding anything else in this Agreement to the contrary, Shipper's obligations under this Agreement, the Service Agreement or any other related agreements are subject to the fulfillment or waiver of the following condition precedent (each a "**Shipper Condition Precedent**" and collectively the "**Shipper Conditions Precedent**"):

i.      Shipper Internal Approvals

Shipper shall have obtained all Shipper Internal Approvals necessary for the consummation of all agreements contemplated by this Agreement no later than thirty (30) days after execution of this Agreement.

If this Shipper Condition Precedent has not been satisfied or waived on or before the date set forth above, then subject to Section 5(C), Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability or any further obligations to the other Party upon prior written notice to Transporter; provided, however, that any such notice of termination must be provided within thirty (30) days of the date  on which Shipper's right to terminate hereunder arises.

ii.  <u>Failure to Receive Notice of Internal Approvals from all Foundation Shippers</u>

Transporter shall have received written notice from Foundation Shippers unaffiliated with Transporter whose Project commitments total at least 750,000 Dth/d of each such Foundation Shipper's receipt of all required internal approvals pursuant to its precedent agreement with Transporter no later than thirty (30) days after the execution of the latest of the relevant executed Foundation Shipper precedent agreements.  Notwithstanding Section 5(C), Transporter shall promptly advise Shipper of the satisfaction, waiver, or failure of this Condition Precedent following the deadline set forth above.

If this Shipper Condition Precedent has not been satisfied or waived in writing by Shipper, then, subject to Section 5(C), Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Transporter; provided, however, that any such notice of termination must be provided within thirty (30) days after the event giving rise to Shipper's right to terminate hereunder.

iii.  <u>Failure by Transporter to Obtain Transporter Regulatory Authorizations or other Regulatory Authorizations</u>

Transporter has received all Transporter Regulatory Authorizations necessary to construct and/or acquire and secure the Project Facilities and to render the proposed Firm Service pursuant to the terms and conditions specified herein (not including related to the filing of the Negotiated Rate Agreement terms) on or before July 1, 2019.

If this Shipper Condition Precedent has not been satisfied or waived in writing by Shipper, then, subject to Section 5(C), Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability to the other Party upon prior written notice to Transporter; provided, however, that any such notice of termination must be provided within thirty (30) days after the event giving rise to Shipper's right to terminate hereunder.

iii.   <u>Tender and Execution of the Service Agreement by Transporter</u>

Transporter has tendered the Service Agreement to Shipper as required by Section 6(A) of this Agreement and Transporter has executed the Service Agreement as required by Section 6(C).

If this Shipper Condition Precedent has not been satisfied or waived on or before the dates set forth below under Section 6, then subject to Section 5(C), Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without either Party having any liability or any further obligations to the other Party upon prior written notice to Transporter; provided, however, that any such notice of termination must be provided within thirty (30) days of the date  on which Shipper's right to terminate hereunder arises.

**C.    Notice; Negotiation Prior to Termination**

For each of the conditions precedent set forth in Section 5(A) and 5(B), the relevant Party shall provide the other with written notice of the satisfaction or waiver of each condition within five (5) business days of the required date for satisfaction of the same.  If notice of termination is provided by Transporter pursuant to Section 5(A) or by Shipper pursuant to Section 5(B), the Parties shall attempt in good faith during the ninety-day (90-day) period following the notice of termination by the relevant Party to negotiate an amendment to this Agreement to accomplish the Parties' respective business objectives as determined in their sole discretion, reasonably exercised.  This Agreement shall terminate at the end of such ninety-day (90-day) period without either Party having any liability to the other Party unless, prior to such date: (1) the Parties mutually agree in writing to an amendment to this Agreement that modifies the condition precedent that gave rise to such termination; (2) the Parties mutually agree in writing to extend the negotiation period; or (3) the terminating Party provides the other Party with written notice that it has elected to withdraw its previously submitted notice to terminate.

**D.    Other Shipper Termination Rights**

i.    <u>Filing of Certificate Application</u>

If Transporter has not filed the Certificate Application for any reason (including Force Majeure) or no reason by July 1, 2017, then Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without Shipper having any liability to Transporter, effective on October 1, 2017, upon written notice to

Transporter ("**Shipper Notice of Termination**") given no later than August 1, 2017; provided, that the Shipper Notice of Termination shall be null and void if Transporter has filed the Certificate Application on or before October 1, 2017.

ii.  Acceptance of FERC Certificate

If Transporter has not received and accepted the FERC Certificate by February 1, 2019 for any reason (including Force Majeure) or no reason, then Shipper shall have the right to terminate this Agreement, the Service Agreement and any other related agreements without Shipper having any liability to Transporter, effective on May 1, 2019, by giving a Shipper Notice of Termination to Transporter no later than March 1, 2019, provided, that the Shipper Notice of Termination shall be null and void if Transporter has received and accepted the FERC Certificate on or before May 1, 2019.

iii.  Commencement of Service

If the Commencement Date for firm transportation service on the Project Facilities does not occur by November 1, 2019 for any reason (including Force Majeure) or no reason, then Shipper shall have the right, to elect to terminate this Agreement, the Service Agreement and any other related agreements without Shipper having any liability to Transporter, effective on February 1, 2020, by giving a Shipper Notice of Termination to Transporter no later than December 1, 2019, provided, that the Shipper Notice of Termination shall be null and void if the Commencement Date occurs on or before February 1, 2020.

If notice of termination is provided by Shipper pursuant to this Section 5(D)(iii), the Parties shall attempt in good faith up to the effective date of the termination to negotiate an amendment to this Agreement to accomplish the Parties' respective business objectives set forth in this Agreement; provided, however, that neither Party shall be required to consent to modifications to this Agreement or the Service Agreement. This Agreement, the Service Agreement and any other related agreements shall terminate on the date set forth in Shipper's notice of termination unless prior to such date: (a) the Project Facilities are placed in service; (b) the Parties otherwise mutually agree in writing to an amendment to this Agreement; (c) the Parties mutually agree in writing to extend the negotiation period; or (d) Shipper provides Transporter with written notice

**FINAL**

that Shipper has elected to withdraw its previously submitted notice to terminate.

**E.    Liquidated Damages**

If the conditions precedent in this Section 5 have been satisfied but Transporter is unable to complete the construction of the Project Facilities and make Firm Service available to Shipper for its entire TQ from the Primary Receipt Points to the Primary Delivery Points set forth herein by no later than July 1, 2019, then: (i) Shipper will not be liable for any payment due (except with respect to transportation services that are being rendered hereunder), nor will the services under the Service Agreement commence, until the Commencement Date, and (ii) subject to any applicable Force Majeure relief pursuant to Section 5(F), Transporter's sole obligation to Shipper, as a Foundation Shipper, in lieu of all other damages or claims applicable for such delay will be to pay Shipper the following liquidated damages  for each day beginning August 1, 2019 ("**Outside Commencement Date**") during which the delay continues, until and ending on July 31, 2020: an amount equal to the TQ multiplied by the applicable negotiated reservation rate; provided that any liquidated damages shall be prorated to the extent of the percentage of Shipper's TQ (as calculated based on Shipper's initial TQ as a percentage of the Project Capacity) that can be transported through the Project Facilities on any such day from Primary Receipt Points to Primary Delivery Points as elected herein, limited to the TQ applicable for such individual points.  If the Commencement Date has not occurred by July 31, 2020 and the liquidated damages provided hereunder have been paid by Transporter beginning on the Outside Commencement Date and continuing until July 31, 2020, then from such date until August 10, 2020, either Party shall have the right to terminate this Agreement and the Service Agreement by written notice to the other Party, and in the event of such a termination neither shall have any further obligations to the other Party hereunder.

To the extent that Transporter owes Shipper for liquidated damages as provided for in this Section 5(E), then no later than ten (10) business days following the last day of each month in which liquidated damages were incurred, Shipper shall deliver an invoice to Transporter for such liquidated damages incurred in accordance with the terms hereof.  The invoice shall set forth the amounts owed (in United States Dollars) and the calculation thereof. Within fifteen (15) days after the receipt of the invoice, Transporter shall pay Shipper the liquidated damages as set forth in the invoice.

F.    **Force Majeure**

Except as otherwise expressly stated in this Agreement, any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure as defined herein, provided that (i) such Party shall give written notice to the other Party of the suspension of such performance or extension of such deadline for this reason as soon as reasonably possible, which notice shall state the date and extent of such suspension and the cause thereof; (ii) as soon as practicable after the occurrence of Force Majeure, the Party claiming Force Majeure shall give written notice to the other Party describing in detail the plan and schedule for overcoming the Force Majeure; and (iii) the Party claiming Force Majeure shall use Commercially Reasonable Efforts to overcome the Force Majeure and resume the performance of any suspended obligations as soon as reasonably possible. Promptly upon the restoration of performance, the Party claiming Force Majeure shall notify the other Party in writing that the suspension has terminated.  Notwithstanding the foregoing, if any Condition Precedent set forth in this Section 5 has not been satisfied by the required deadline as a result of an occurrence of Force Majeure, or if any deadline set forth in Section 5(E) is not met as a result of the occurrence of Force Majeure if applicable, then such deadline shall be extended for each day that the occurrence of Force Majeure continues for up to a maximum of 180 days or as mutually agreed to by the Parties.   "**Force Majeure**" as employed herein shall mean any cause, whether of the kind enumerated herein or otherwise, not within the reasonable control of the Party claiming Force Majeure, and which by the exercise of due diligence, such Party has been unable to prevent or overcome, including without limitations acts of God, the government, or a public enemy; strikes, lockouts, or other industrial disturbances; wars, terrorism, blockades, or civil disturbances of any kind; epidemics, landslides, hurricanes, washouts, tornadoes, storms, fires, explosions, arrests, and restraints of governments or people, and the inability or delay of either such Party to acquire, , at a commercially reasonable cost and after the exercise of Commercially Reasonable Efforts, any of the following: (a) any servitudes, rights of way, grants, permits or licenses; (b) any materials or supplies for the construction or maintenance of facilities; or (c) any Transporter Regulatory Approvals; if such are required to enable Transporter to fulfill its obligations hereunder.

G.    **Development Costs**

In the event Transporter terminates this Agreement as permitted herein due to Shipper's material breach of its obligations hereunder, including without limitation its obligations under Sections 3(B), 3(C) and 6(B), Shipper shall pay

Transporter its pro rata share of the commercially reasonable costs actually incurred and/or committed by Transporter and associated with the activities listed in the next sentence below for the development of the Project based on Shipper's TQ in relation to the Project Capacity, less payments made by Shipper for transportation service ("**Development Costs**"); provided, however, that Transporter shall make reasonable efforts to mitigate the amount of Development Costs for which Shipper shall be responsible. The Development Costs are those meeting the above definition and associated with the following activities undertaken prior to termination of this Agreement: (i) participating in the FERC pre-filing process; (ii) preparing and filing Transporter's application for a FERC Certificate; (iii) developing, designing, surveying and performing studies to define the scope of the Project; (iv) developing the design and engineering of the Project Facilities; (v) preparing all drawings, maps, reports and schedules necessary to be included in Transporter's application for a FERC Certificate; (vi) contacting and meeting with any and all stakeholders to gain support for, or to appease opposition to, the Project; (vii) preparing, filing and processing all relevant applications for Transporter Regulatory Authorizations; (viii) identifying the suitability of the property on which certain of the Project Facilities will be constructed and any construction areas that will be needed as part of the Project; and (ix) acquiring equipment and materials for the construction of any portion of the Project Facilities if necessary due to lead times required for such equipment and materials to be available when needed.

To the extent that Shipper owes Transporter for Development Costs as provided in this Section 5(G), not later than ninety (90) days following the termination of this Agreement, Transporter shall deliver an invoice to Shipper for such Development Costs incurred in accordance with the terms hereof. The invoice shall set forth all charges and credits (in United States Dollars) summarized by appropriate classifications indicating the nature of the charges in sufficient detail and with supporting documentation necessary for Shipper to verify the charges set forth in the invoice. Within thirty (30) days after the receipt of the invoice, Shipper shall pay Transporter such Development Costs set forth in the Invoice; provided that, for a period of eighteen (18) months following the date of the invoice, any Development Costs charged to Shipper and mitigated by Transporter by obtaining an incremental new commitment to firm service on the Project from a Replacement Shipper shall be credited to Shipper's account and paid to Shipper within thirty (30) days of realization of any such savings or revenues. For purposes of this Section 5(G), the term "Replacement Shipper" shall mean any shipper contracting for firm service on the Project utilizing Project capacity that would not have been available to such shipper without the termination of this Agreement due to Shipper's contractual commitment to that capacity, or any

existing shipper that increases its TQ and could not otherwise have increased its TQ on the Project but for the termination of this Agreement due to Shipper's contractual commitment to that capacity. Shipper shall have right to inspect and audit Transporters books and records relating to the Development Costs for a period of one year after the closing of Transporter's books related to such costs.

6. **Delivery and Execution of Service Agreement**

   A. **Delivery of Service Agreement for Execution**

   Within sixty (60) days after the date on which Transporter accepts a FERC Certificate for the Project, Transporter shall deliver to Shipper for Shipper's execution (i) an FTS Agreement in a form substantially similar to Exhibit A hereto and consistent in all material respects with this Precedent Agreement; and (ii) a Negotiated Rate Agreement in a form substantially similar to Exhibit B hereto, and consistent in all material respects with this Precedent Agreement. The Parties agree to consider in good faith executing the FTS Agreement and the Negotiated Rate Agreement at a time earlier than contemplated in the previous sentence if required to allow Transporter to obtain the requisite notice to proceed with Project construction from any governmental agency of authority having jurisdiction.

   B. **Execution of Service Agreement by Shipper**

   Shipper shall be required to execute and return to Transporter the FTS Agreement and the Negotiated Rate Agreement delivered by Transporter to Shipper pursuant to Section 6(A) of this Agreement no later than ten (10) days following receipt of the FTS Agreement and the Negotiated Rate Agreement pursuant to Section 6(A).

   C. **Execution of Service Agreement by Transporter**

   Transporter shall be required to execute the FTS Agreement and the Negotiated Rate Agreement no later than ten (10) days following the receipt of the FTS Agreement and Negotiated Rate Agreement executed by Shipper.

7. **Notices**

   Any notice and/or request provided for in this Agreement or any notice either Party may desire to give to the other shall be transmitted in writing (overnight delivery, U.S. Mail, or electronic mail) such that it is received before 5 p.m. Central time on the due date.

   Transporter:

   Midship Pipeline Company, LLC
   c/o Cheniere Energy, Inc.

**FINAL**

700 Milam Street, Suite 1900
Houston, TX 77002
Email: cheniere.midship@cheniere.com
With a copy to (which shall not constitute notice):

Cheniere Energy, Inc.
700 Milam Street, Suite 1900
Houston, TX 77002
Attention: Legal Department

Shipper:

Gulfport Energy Corporation
3001 Quail Springs Parkway
Oklahoma City, OK 73134
Attn: Ty Peck

Notice shall be effective as of the date of confirmed receipt, or, in the absence of confirmed receipt, as of the date actually received.

8. **Assignment**

Any entity that shall succeed by purchase, merger, or consolidation, or other transfer of the properties of either Transporter or Shipper, either substantially or as an entirety or of the producing properties associated with transportation service contemplated hereunder, shall be entitled to the rights and shall be subject to the obligations of its predecessor in interest under this Agreement, without any further liability of such predecessor in interest. Either Party may, without relieving itself of its obligations under this Agreement, assign any of its rights hereunder to an Affiliate, or to an entity described in the prior sentence, but otherwise no assignment of this Agreement or of any of the rights or obligations hereunder shall be made, unless there first shall have been obtained the written consent thereto of the other Party to this Agreement, which consent shall not be unreasonably withheld, conditioned, or delayed. Any assignee or replacement shipper shall be subject to and shall meet the credit requirements set forth in Section 3 of this Agreement.

Once the Service Agreement is executed by both Parties and service has commenced thereunder, any assignment of such Service Agreement is subject to the terms and conditions of Transporter's Tariff and this Agreement. The Parties agree to cooperate in the preparation and filing of all necessary applications for authorizations related to any assignment conforming to this Section 8 and, subject to the terms and conditions herein, agree to proceed with due diligence to prosecute such application(s), if necessary. The restrictions on assignment contained in this Section 8 shall not in any way prevent either Party to this Agreement from assigning its rights hereunder as security for its

indebtedness.  Notwithstanding anything set forth herein to the contrary and without limitation the foregoing, either Party (together with its successors and permitted assigns) may collaterally assign this Agreement and the Service Agreement and its rights and obligations hereunder and thereunder to any financing sources.  In connection with any such assignment, the other Party (together with its successors and permitted assigns) agrees to execute such documents as may be reasonably requested by such financing sources, or by subsequent assignees or designees of such financing sources, to evidence and acknowledge its consent and the effectiveness of any such assignment or lien.

## 9.    Miscellaneous

### A.    Project Status Updates

Upon the Effective Date of this Agreement and continuing until the Commencement Date, Transporter shall provide Shipper with written periodic updates regarding the progress of the Project.  Between execution of this Agreement and the commencement of construction activities, Transporter shall provide such updates on a quarterly basis.  Following the commencement of construction activities, Transporter shall provide such updates on a monthly basis until the Commencement Date.

### B.    Modification

No modification of the terms and provisions of this Agreement shall be made except by the execution by both Parties of a written agreement.

### C.    Choice of Law

THE INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT SHALL BE IN ACCORDANCE WITH AND CONTROLLED BY THE LAWS OF THE STATE OF TEXAS, EXCEPT THAT ANY CONFLICT OF LAWS RULE OF THE STATE OF TEXAS THAT WOULD REQUIRE REFERENCE TO THE LAWS OF SOME OTHER STATE OR JURISDICTION SHALL BE DISREGARDED.  ANY DISPUTE UNDER THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN HARRIS COUNTY, TEXAS, AND EACH PARTY HEREBY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY OBJECTION ON CONVENIENCE, JURISDICTION, OR ANY OTHER GROUNDS.  EACH PARTY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT.  Nothing in the Agreement precludes either Party from bringing proceedings in any other jurisdiction to enforce any judgment obtained

**FINAL**

in any proceedings referred to in this paragraph, nor will bringing of such enforcement proceedings in any one or more jurisdictions preclude the bringing of enforcement proceedings in any other jurisdiction.

**D.    Term**

Unless terminated sooner pursuant to the terms herein, this Agreement shall terminate upon the Commencement Date; provided that Section 5(E) and 5(G) shall survive any termination of this Agreement prior to the Commencement Date, and Sections 1(F), 1(J), 1(K), 3(C), 8, 9(C), 9(D), 9(E), 9(F), 9(H), 9(J) and 9(M) and Exhibit "G" shall survive the termination of this Agreement and shall remain in effect until all obligations under this Agreement and the Service Agreement have been satisfied in full.

**E.    No Waivers**

Except as expressly provided herein, no waiver by a Party of any default(s) by the other Party in the performance of any provision, condition, or requirement of this Agreement shall operate or be construed as a waiver of any future default(s), whether of a like or of a different character, nor in any manner release the defaulting Party from performance of any other provision, condition, or requirement herein.

**F.    Limitation of Liability and Remedies**

NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO PRECLUDE THE PARTIES FROM PURSUING ANY REMEDY AT LAW OR EQUITY FOR THE OTHER PARTY'S BREACH OF THIS AGREEMENT UNLESS SPECIFICALLY PROVIDED OTHERWISE HEREIN; PROVIDED, HOWEVER, *THAT NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, BY STATUTE, IN TORT OR CONTRACT OR OTHERWISE*. FOR THE AVOIDANCE OF DOUBT, THE PARTIES AGREE THAT THE PAYMENT OF LIQUIDATED DAMAGES BY TRANSPORTER IN ACCORDANCE WITH SECTION 5(E) OR DEVELOPMENT COSTS BY SHIPPER IN ACCORDANCE WITH SECTION 5(G) SHALL NOT CONSTITUTE CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES AND NO SUCH PAYMENT SHALL BE PRECLUDED BY THIS SECTION 9(F).  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES BE WITHOUT REGARD TO CAUSE OR CAUSES RELATED THERETO, INCLUDING WITHOUT LIMITATION THE NEGLIGENCE  OF

ANY PARTY, WHETHER SUCH NEGLIGENCE   BE SOLE, JOINT, OR CONCURRENT, OR ACTIVE OR PASSIVE.

**G.    Agreement Subject to Regulatory Authorities**

This Agreement, all of the terms and provisions contained herein and the respective obligations of the Parties are subject to Transporter's Tariff and to all valid laws, orders, rules and regulations of duly constituted governmental authorities having jurisdiction.

**H.    Severability**

If any provision of this Agreement is declared null and void or voidable by a court of competent jurisdiction, such declaration shall in no way affect the validity or effectiveness of the other provisions of this Agreement, which shall remain in full force and effect and the Parties shall thereafter undertake Commercially Reasonable Efforts to agree upon an equitable adjustment of the provisions of this Agreement with a view to effecting its purpose.

**I.    No Presumption Against Drafter**

No presumption shall operate in favor of or against any Party as a result of any responsibility or role that any Party may have had in the drafting of this Agreement.

**J.    Confidentiality**

Each Party shall hold the substance and terms of this Agreement confidential during the Term, but may disclose the substance and terms of this Agreement to its or its Affiliates' directors, officers, employees, representatives, agents, members, partners, lenders, consultants, attorneys or auditors ("**Representatives**") or any permitted assignee or permitted prospective assignee or its Representatives, in each case who have a need to know the substance and terms of this Agreement and who are subject to a confidentiality agreement or obligation covering the disclosed information.  Neither Party shall disclose or communicate, and will cause its Representatives not to disclose or communicate, the substance or terms of this Agreement to any other person, entity, firm, or corporation without the prior written consent of the other Party; provided that Transporter may file the Agreement as a privileged and confidential document, as provided in applicable regulations, in any applications for Transporter Regulatory Authorizations.  Either Party or its Representatives may disclose the substance or terms of this Agreement as requested or required by law, order, rule or regulation of any duly constituted governmental body or official authority having

**FINAL**

jurisdiction; provided however, the Party compelled to disclose the Agreement shall give prompt written notice of such requirement to the other Party so that either Party may seek a protective order or other appropriate remedy and/or waive the compliance with the terms hereof.  In connection with any filing of this Agreement at FERC, the filing party shall seek confidential treatment of this Agreement in accordance with FERC's regulations. For the avoidance of doubt, the confidentiality obligations of this section shall not apply to any terms of the Agreement which are to be reflected in the Service Agreement or the Negotiated Rate Agreement, only to the extent that such terms are required to be filed at FERC for approval and/or for inclusion in the Tariff but subject to the filing party seeking confidential treatment in accordance with, and to the extent such treatment is available under, FERC's regulations.

**K.      Entire Agreement**

This Agreement sets forth all understandings and agreements between the Parties respecting the subject matter hereof, and all prior agreements, understandings and representations, whether written or oral, respecting the subject matter hereof are merged into and superseded by this Agreement.  In the event of any conflict between the terms of this Agreement and the Service Agreement, the terms of the following agreements shall control in the following order: this Agreement, and the Service Agreement.

**L.      Execution of Agreement**

This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute but one and the same instrument.

**M.      Definition of Commercially Reasonable Efforts**

The term "**Commercially Reasonable Efforts**" means all reasonable efforts and reasonable expenditures that the performing Party, with the intention of performing its contractual obligations in full and using reasonable standards for performance in the natural gas pipeline industry, would employ in good faith to diligently pursue and timely satisfy its obligations under this Agreement including, where necessary, the expenditure of additional funds and/or the incurrence of additional costs beyond those initially budgeted or projected; provided, however, that the performing Party shall not be required to take additional actions, incur additional costs, and/or expend additional funds that would render performance of this Agreement economically infeasible.

**FINAL**

**N.** **Definition of Affiliate**

For all purposes hereunder, "**Affiliate**" means, with respect to a Party, any corporation, partnership or other entity or association that directly, or indirectly through one or more intermediaries, controls such Party, or is controlled by such Party or is under common control with such Party.  The terms "control(s)" or "controlled" mean the power to direct the management and policies of an entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise.  Ownership of more than 50% of the voting securities of an entity shall be deemed "control."

*[Signature Page Follows]*

FINAL

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first hereinabove written.

**Midship Pipeline Company, LLC**

By: _____

Name: Chad Zamarin

Title:   President


**Gulfport Energy Corporation**

By: _____

Name: Michael G. Moore

Title:   President and Chief Executive Officer

[Signature Page to Precedent Agreement]

**FINAL**

## EXHIBIT A TO PRECEDENT AGREEMENT

## FORM OF GAS TRANSPORTATION AGREEMENT
### (For Use Under FTS Rate Schedule)

FORM OF FIRM TRANSPORTATION SERVICE AGREEMENT
RATE SCHEDULE FTS

Date: _____

Contract No. _____, Rev No. _____

## FIRM TRANSPORTATION SERVICE AGREEMENT

This FIRM TRANSPORTATION SERVICE AGREEMENT (herein referred to as the "FTS Agreement") is entered into by MIDSHIP PIPELINE COMPANY, LLC (herein referred to as "Transporter") and _____ (herein referred to as "Shipper").

WHEREAS, Shipper has requested Transporter to transport Gas on its behalf and Transporter represents that it is willing to transport Gas under the terms and conditions of this FTS Agreement.

NOW, THEREFORE, Transporter and Shipper agree to the terms below. Transporter shall perform and Shipper shall receive service in accordance with the provisions of this FTS Agreement, the Negotiated Rate Agreement, (the FTS Agreement and the Negotiated Rate Agreement shall be referred to herein as the "Service Agreement"), the effective FTS Rate Schedule, and applicable General Terms and Conditions of Transporter's FERC Gas Tariff on file with the Federal Energy Regulatory Commission ("FERC" or "Commission"), as may be amended or superseded in accordance with the rules and regulations of the Commission.

1. AUTHORITY FOR FIRM TRANSPORTATION SERVICE:

   Authority for Firm Transportation Service shall be under Part 284, Subpart B or G of the Commission's regulations.

2. CONTRACT DATA:

   The MDTQ per Zone shall be:

   Zone 1: _____ Dth

   Zone 2: _____ Dth

   A list of the Primary Receipt/Delivery Point(s), Receipt/Delivery Point MDQ(s) and Total MDTQ are provided on the attached Appendix A.

3. TERM:

   This FTS Agreement shall become effective when executed by Transporter and Shipper. Service hereunder will commence on _____ (the "**Commencement Date**") and will continue in force and effect until 9:00 a.m. Central Clock Time on _____ ("Primary Term").

Shipper shall have the right to request to negotiate an extension of the Primary Term during the last year of the Primary Term. If Shipper desires to change or modify all or a portion of the Firm Service under its Service Agreement (e.g. rates, Term, MDTQ, receipt and delivery points), then at least nine (9) months prior to the expiration of the Primary Term, Shipper shall have the right to notify Transporter in writing of its intent to renegotiate the Service Agreement. Upon such notification, Shipper and Transporter shall enter into negotiations in accordance with the terms of the Precedent Agreement between Shipper and Transporter dated [___].  If the Parties agree to extend the Primary Term and modify any other terms of the Firm Service under the Service Agreement, then the Parties will execute a replacement Service Agreement (including both the FTS Agreement and Negotiated Rate Agreement, as necessary) reflecting the modified terms thereto (“**Negotiated Service Agreement**”), and the prior Service Agreement shall, upon execution of the Negotiated Service Agreement, be of no further force or effect.

In the event that Shipper elects to not negotiate an extension of the term as aforesaid or the Parties fail to execute a new Negotiated Service Agreement within the allotted time period, Shipper shall have the right to renew the Service Agreement for up to five (5) additional years ("**First Renewal Term**"). If Shipper desires to extend the term of the Service Agreement for the First Renewal Term at the then current transportation rate(s), it shall notify Transporter in writing of its election at least six (6) months prior to the expiration of the Primary Term. Shipper’s election notice shall specify the term of the First Renewal Term, the applicable MDTQ, and Primary Receipt Point(s) and Primary Delivery Point(s). Should the Primary Receipt or Primary Delivery Points be different from Shipper’s current Primary Receipt and Primary Delivery Points under the FTS Agreement, then such changes shall be submitted in accordance with Transporter’s Tariff and will be subject to available capacity.  The MDTQ on the First Renewal Term will be up to but no greater than the MDTQ at the time the renewal rights are exercised. The First Renewal Term may not be less than one (1) year. If Shipper declines to renew the Service Agreement for the First Renewal Term, the Shipper shall have those ROFR rights as described herein below.

If the Parties have executed either (i) a Service Agreement for the First Renewal Term or (ii) a Negotiated Service Agreement pursuant to the foregoing terms, then Shipper has the right to negotiate an extension of Shipper’s Firm Service during the last year of the First Renewal Term or the last year of the Negotiated Service Agreement, as applicable, in accordance with the terms of the Precedent Agreement.  If the Parties agree to so extend the term and modify any other terms of the Firm Service under the Negotiated Service Agreement, then the Parties will execute a replacement Negotiated Service Agreement (including both the FTS Agreement and Negotiated Rate Agreement, as necessary) reflecting the modified terms thereto, and the prior Negotiated Service Agreement shall, upon execution of the replacement Negotiated Service Agreement, be of no further force or effect.

If Shipper and Transporter agreed to a First Renewal Term or a Negotiated Service Agreement in accordance with the foregoing, and Shipper elects to not negotiate a replacement Negotiated Service Agreement or the Parties fail to execute a replacement Negotiated Service Agreement within the allotted time period, Shipper shall have the right to extend the term of the Service Agreement for a second renewal term of up to five

(5) additional years (the "**Second Renewal Term**", and each of the First Renewal Term and the Second Renewal Term, the "**Renewal Terms**"),  at the then current transportation rate(s), and Shipper in that event shall notify Transporter in writing of its election at least six (6) months prior to the expiration of the First Renewal Term. Shipper's election notice shall specify the term of the Second Renewal Term, the applicable TQ, and Primary Receipt Point(s) and Primary Delivery Point(s). Should the Primary Receipt or Primary Delivery Points be different from Shipper's current Primary Receipt and Primary Delivery Points under the FTS Agreement, then such changes shall be submitted in accordance with Transporter's Tariff and will be subject to available capacity. The TQ on the Second Renewal Term will be up to but no greater than the TQ at the time the renewal rights are exercised. The Second Renewal Term may not be less than one (1) year. If Shipper declines to renew the Service Agreement for the Second Renewal Term, then Shipper shall have those ROFR rights as described herein below.

Transporter hereby grants Shipper a contractual right of first refusal ("**ROFR**") upon the expiration of the Primary Term, including any extension thereof in accordance with this Section 3.  For the sake of clarity, the ROFR granted by Transporter to Shipper hereunder consists of the rights set forth in the General Terms and Conditions of Transporter's Tariff in the relevant section regarding "Right of First Refusal" as the same is approved and in effect during the Term, and shall apply to Shipper notwithstanding the fact that Shipper will not pay maximum tariff rates under the Service Agreement.

The Primary Term, First Renewal Term (if applicable), Second Renewal Term (if applicable), and any extension pursuant to any applicable ROFR shall collectively be referred to herein as the "**Term**."

4.     RATES:

Maximum rates, charges, and fees shall be applicable for the entitlements and quantities delivered pursuant to this Service Agreement unless Transporter has advised Shipper in writing at the address below or by Transporter's Internet website that it has agreed otherwise. Nothing herein shall obligate Transporter to provide service at less than the maximum rates, unless a Negotiated Rate is otherwise agreed to by the parties in writing. Transporter may agree to provide service to Shipper at a specified discount, in which case such discount shall not be provided at a rate lower than the variable costs included in Transporter's currently effective usage rate. If Shipper and Transporter agree to a Negotiated Rate and specified term for service hereunder, provisions governing such Negotiated Rate and term shall be applicable, as set forth in Section 7 herein and as reflected in Appendix B below.

It is further agreed that Transporter may seek authorization from the Commission and/or other appropriate body at any time and from time to time to change any rates, charges or other provisions in the applicable Rate Schedule and General Terms and Conditions of Transporter's FERC Gas Tariff, and Transporter shall have the right to place such changes in effect in accordance with the Natural Gas Act. This FTS Agreement shall be deemed to include such changes and any changes which become effective by operation of law and Commission order. Nothing contained herein shall be construed to deny Shipper any rights it may have under the Natural Gas Act, including the right to participate fully

in rate or other proceedings by intervention or otherwise to contest increased rates in whole or in part. Notwithstanding the foregoing, Transporter and Shipper agree not to initiate any proceeding before the FERC with respect to a Negotiated Rate set forth in Section 7 and Appendix B herein and for the effective term of such Negotiated Rate.

5.     INCORPORATION BY REFERENCE:

The General Terms and Conditions of Transporter's FERC Gas Tariff are incorporated by reference in their entirety in this FTS Agreement. If a conflict arises between the General Terms and Conditions of Transporter's FERC Gas Tariff and the provisions of this FTS Agreement, the General Terms and Conditions shall control.

6.     NOTICES:

All notices can be given by telephone or other electronic means; however, such notice shall be confirmed in writing at the addresses below or through Transporter's Internet Website. Shipper or Transporter may change the addresses below by written notice to the other without the necessity of amending this FTS Agreement:

TRANSPORTER:                                        SHIPPER:
    Midship Pipeline Company, LLC          _____
    700 Milam, Suite 1900                          _____
    Houston, Texas 77002                          _____

    Attention: Customer Services               Attention: _____
    Telephone: 713-375-5000                     Telephone: _____
    Fax: 713-375-6000                               Fax: _____
    Email: cheniere.midship@cheniere.com   Email: _____

INVOICES AND STATEMENTS:                  NOMINATIONS:

    _____          _____
    _____          _____
    _____          _____

    Attention: _____            Attention: _____
    Telephone: _____            Telephone: _____
    Fax: _____            Fax: _____
    Email: _____             Email: _____

ALL OTHER MATTERS:

    _____
    _____
    _____
    Attention: _____
    Telephone: _____
    Fax: _____

Email: _____

7.      SPECIFICATION OF NEGOTIATED RATE (if applicable):

Negotiated Rate _____ ($/Dth).  Please see Appendix B attached hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Firm Transportation Service Agreement to be signed by their respective officers or representatives, thereunto duly authorized to be effective as of the date stated in Section 3 of this FTS Agreement.

TRANSPORTER:                                SHIPPER:

MIDSHIP PIPELINE COMPANY, LLC          _____

By:_____     By:_____

Title:_____     Title:_____

Date:_____     Date:_____

APPENDIX A
TO FIRM TRANSPORTATION SERVICE AGREEMENT NO. _____
UNDER RATE SCHEDULE FTS


BETWEEN: Midship Pipeline Company, LLC. and _____

MAXIMUM DAILY TRANSPORTATION QUANTITY ("MDTQ"):

    Zone 1           _____ Dth
    Zone 2           _____ Dth

ORIGINAL CONTRACT TERM:

    Begin Date   _____      End Date   _____

AMENDMENT DATE: _____      REVISION NO.: _____

PRIMARY RECEIPT POINT MDQ:

| Receipt Point | Receipt Point MDQ |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| TOTAL: | _____ |


PRIMARY DELIVERY POINT MDQ:

| Delivery Point | Delivery Point MDQ |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| TOTAL: | _____ |

PRESSURE OBLIGATION AT RECEIPT POINTS:

Enlink Chisholm - Shipper shall not be required to deliver above 1100 psig and Transporter shall not operate the receipt point at a pressure higher than 1100 psig unless mutually agreed upon by both parties

Oneok Canadian Valley - Shipper shall not be required to deliver above 1100 psig and Transporter shall not operate the receipt point at a pressure higher than 1100 psig unless mutually agreed upon by both parties

Enlink Cana - Shipper shall not be required to deliver above 1000 psig and Transporter shall not operate the receipt point at a pressure higher than 1000 psig unless mutually agreed upon by both parties

WEX Grady - Shipper shall not be required to deliver above 1150 psig and Transporter shall not operate the receipt point at a pressure higher than 1150 psig unless mutually agreed upon by both parties

Targa Velma - Shipper shall not be required to deliver above 850 psig and Transporter shall not operate the receipt point at a pressure higher than 850 psig unless mutually agreed upon by both parties

RATE AND CHARGES: Shipper shall pay all applicable rates and charges as reflected on the currently effective rate section (Section 4) filed as part of Transporter's FERC Gas Tariff, subject to the following:

Applicable Rates are exclusive of fuel recovery, applicable surcharges and lost and unaccounted for gas recovery.

See Appendix B for Negotiated Rate Agreement.

MIDSHIP PIPELINE COMPANY, LLC

By: _____

Title: _____

Date: _____


_____

By: _____

Title: _____

Date: _____

FINAL

**EXHIBIT B TO PRECEDENT AGREEMENT**

**FORM OF NEGOTIATED RATE AGREEMENT**

APPENDIX B
TO FIRM TRANSPORTATION SERVICE AGREEMENT NO. _____
UNDER RATE SCHEDULE FTS

FORM OF NEGOTIATED RATE AGREEMENT

_____ 20,_____

Midship Pipeline Company, LLC
700 Milam, Suite 1900
Houston, Texas 77002

_____

_____

Re:  Negotiated Rate Agreement for Firm Transportation Service

Dear Shipper:

This Negotiated Rate Agreement ("Negotiated Rate Agreement") specifies additional terms and conditions applicable to the referenced Firm Transportation Service Agreement ("FTS Agreement") between, Cheniere Midstream Holdings, Inc. ("Transporter") and _____ ("Shipper").  Transporter and Shipper may be referred to herein together as "Parties", and each may be referred to herein individually as a "Party".  This Negotiated Rate Agreement is subject to all applicable Federal Energy Regulatory Commission ("FERC" or "Commission") regulations.  In the event the language of this Negotiated Rate Agreement conflicts with Transporter's FERC Gas Tariff ("Tariff"), the language of the Tariff and the provisions of the FTS Agreement, the provisions of this Negotiated Rate Agreement shall control.

1.    Pursuant to Section 7 of the FTS Agreement, Transporter has agreed to charge a negotiated rate for the services described therein.  During the term of the FTS Agreement, the negotiated transportation rate shall be a reservation charge of the following:

(a)    $_____ per Dth, including for all Shipper nominations from the Primary Receipt Point zone to the Primary Delivery Point zone, as set forth in the Transporter's Tariff, as the same is effective from time to time;

(b)    $_____ per Dth for all other secondary firm nominations, in accordance with the Tariff; and

(c)    $_____ per Dth for Authorized Overrun volumes

(collectively, the *"Negotiated Rate"*).

The Negotiated Rate is applicable during the Primary Term as defined in Section 3 of the FTS Agreement, and during any Renewal Term(s), unless the Transporter and the Shipper have executed a Negotiated Service Agreement (as defined in the FTS Agreement) during the last year

of the Primary Term, or a replacement Negotiated Service Agreement during the last year of the Negotiated Service Agreement or the First Renewal Term, as applicable, in which event the Negotiated Rate shall be as set forth in the new Negotiated Rate Agreement and the new FTS Agreement, (or in the event of the Parties executing a replacement Negotiated Service Agreement, the replacement Negotiated Rate Agreement and the replacement FTS Agreement), each of which shall be applicable for the agreed extended period.  In all other instances, Shipper shall pay the charges set forth in the Tariff.  The Negotiated Rate does not include the fuel retainage percentage, which shall be retained in accordance with the Tariff as it may be revised from time to time.

2.     The foregoing notwithstanding, in the event that the total aggregate volume reflected in all shippers' firm service commitments to the Project at the time of the Commencement Date equals or exceeds 1,000,000, Dth/day, the Negotiated Rate will be decreased by $0.01.

3.     The Negotiated Rate shall be subject to adjustment as follows: To the extent Transporter's fuel retainage percentage exceeds 0.8% in a given calendar year during the Term, there shall be an adjustment to the Negotiated Rate for the next following calendar year by an appropriate percentage to compensate Shipper for the fuel retainage obligation above the threshold set forth in this sentence, based on the average Monthly Bidweek Gas Prices for ONEOK, Okla. under the heading "Midcontinent" as published by Platts Inside FERC's Gas Market Report for such prior year.  In the event said index is discontinued, the Parties shall agree upon a replacement index.  The Negotiated Rate shall apply to Shipper's deliveries to secondary delivery points on the Project, made in accordance with the applicable provisions of the Tariff.

4.     **Negotiated Rate Adjustment for Overrun Volumes.**  In addition, Shipper shall be entitled to an adjustment to the Negotiated Reservation Charge in accordance with this Section.  Specifically, in the event that:

(a)     in one or more calendar year(s) during the Term (other than either of the last two years thereof regardless of any subsequent extension), Shipper transports aggregate volumes on the Project from any receipt point to any delivery point in excess of the MDTQ multiplied by the number of days in the relevant calendar year, excluding unauthorized overrun volumes (such amount for a given calendar year, an "**Annual Overrun Quantity**"), and

(b)      in any other calendar year during the Term (other than the last year thereof regardless of any subsequent extension) that follows a year in which there was an Annual Overrun Quantity amount available, Shipper transports aggregate volumes on the Project from any receipt point to any delivery point less than the MDTQ multiplied by the number of days in the relevant calendar year (such amount for a given calendar year, an "**Annual Underrun Quantity**"), then

(c)     during the year of the Term that immediately follows the year of the Annual Underrun Quantity, the Negotiated Reservation Charge shall be reduced by an appropriate percentage that results in a reduction to the aggregate reservation charges paid by Shipper during such year for the MDTQ multiplied by the

number of days in that year that is consistent with the following sentence.  The reduction in Shipper's aggregate reservation charges for the MDTQ in the year following the year in which there has been an Annual Underrun Quantity shall be the lesser of: (x) the product of the Annual Underrun Quantity multiplied by the unrevised Negotiated Reservation Charge, and (y) the product of the aggregate of the accumulated Annual Overrun Quantity multiplied by the unrevised Negotiated Reservation Charge.  To the extent that after such determination there remains any Annual Overrun Quantity, such balance shall be carried forward to be applied the next time that there is an Annual Underrun Quantity, together with any additional Annual Overrun Quantity that may have arisen prior to such time.

5.    Subject to, and consistent with, Section 7 of the FTS Agreement, Shipper agrees to pay the fixed Negotiated Rate for the Firm Transportation Service.  Further, Shipper Agreements to pay: (i) the applicable Annual Charge Adjustment surcharge as set forth in the Tariff and applicable to service under Rate Schedule FTS from time to time, and (ii) any other charges and surcharges, if any, applicable to service under Rate Schedule FTS pursuant to any FERC-approved cost recovery mechanism of general applicability under such Rate Schedule, including any surcharge or other charge which is designed to recover costs that are incurred due to a mandate from FERC or any other governmental authority, or otherwise related to pipeline safety or environmental compliance costs associated with Transporter's operations pursuant to Transporter's Tariff.

6.    Should the Commission or a court with jurisdiction issue a ruling that has the effect of prohibiting Transporter from collecting, or require Transporter to charge more than the rates and charges provided for herein, then the Parties agree to enter into a substitute lawful arrangement, such that the parties are placed in the same economic position as if Transporter had collected only the rates and charges set forth herein.  Failing such agreement, Shipper may terminate this Agreement and the Service Agreement upon giving Transporter ninety (90) days' notice with no liability to Transporter hereunder or thereunder, except for the payment of the Negotiated Rate for transportation service rendered prior to termination.

7.    **Most Favored Nations.** If, any time and from time to time during the first five (5) years of the Primary Term of the Service Agreement, Transporter agrees to provide any shipper a rate or rates for firm or interruptible transportation service utilizing some or all of the Project Facilities in the applicable rate zone(s) in which Shipper's Primary Receipt Point(s) and Primary Delivery Point(s) are located (other than a negotiated rate for another Foundation Shipper that is the result of a temporary rate adjustment to account for an Annual Overrun credit in accordance with such Foundation Shipper's negotiated rate agreement) from any receipt point on the Project Facilities, within the applicable rate zone(s) as set forth above, which third party rate is less than the Negotiated Rate, then Transporter will (x) immediately notify Shipper in writing of such agreement, (y) provide Shipper with the negotiated rate terms agreed to with the third party shipper within 5 business days following the execution thereof in order for Shipper to verify whether Shipper's rights are trigger by such agreement, and (z) offer Shipper the same lower rate or rates as of the date that Transporter begins providing the lower rate or rates to the other shipper for the same term that Transporter has agreed to provide to the other shipper but not to exceed the Primary Term of the Service Agreement. This most favored nations provision shall apply regardless of: (i) the type of rate or rates offered to the other shipper (e.g. negotiated

rate, discounted rate, firm service rate, interruptible service rate, recourse rate, or otherwise); (ii) the classification of the other shipper offered the lower rate or rates (e.g., Foundation Shipper, Open Season shipper, or otherwise); (iii) whether the receipt point(s) or the delivery point(s) for the other shipper are the same as those listed in Shipper's FTS Agreement or are located anywhere else on the Facilities within the applicable rate zone(s) as set forth above; (iv) the duration of the contracted primary term for the other shipper; or (v) the maximum daily quantity the other shipper has committed to on the Facilities or any expansion thereof.  If Shipper is willing to accept the offer of the revised rate or rates then Shipper shall notify Transporter within ten (10) business days of Shipper's receipt of such offer, and the Parties will enter into an amendment to this Agreement and/or the Service Agreement, as applicable, at the lower rate or rates.

The foregoing sets forth the entire agreement between the Parties as it relates to any negotiated rate under the Firm Transportation Service Agreement, and may only be amended or modified by written agreement, duly executed by both Parties.  This Agreement shall be effective immediately upon acknowledgement and acceptance by _____, 20___.

Sincerely,

MIDSHIP PIPELINE COMPANY, LLC

By: _____

Name: _____

Title: _____


AGREED AND ACCEPTED ON THIS ____
DAY OF _____, ____

_____

By: _____

Name: _____

Title: _____

FINAL

## EXHIBIT C TO PRECEDENT AGREEMENT

## FORM OF GUARANTY

## EXHIBIT C

## FORM OF GUARANTY

THIS GUARANTY (this "**Guaranty**"), dated as of _____, ____ (the "**Effective Date**"), is made by [*INSERT NAME OF SHIPPER'S CREDITWORTHY GUARANTOR IN ALL CAPS*] ("**Guarantor**"), in favor of [*INSERT TRANSPORTER'S NAME IN ALL CAPS*] ("**Counterparty**").

### RECITALS:

**A.** WHEREAS, Counterparty and Guarantor's indirect, wholly-owned subsidiary [*INSERT SHIPPER'S NAME IN ALL CAPS*] ("**Obligor**") have entered into, or concurrently herewith are entering into, that certain Precedent Agreement [dated/made/entered into/effective] as of March 15, 2017 (the "**Agreement**");

**B.** WHEREAS, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement; and

**C.** WHEREAS, Guarantor will directly or indirectly benefit from the Agreement and the Service Agreement (as they may be amended, supplemented and replaced from time to time, collectively the "**Agreements**");

NOW THEREFORE, in consideration of the foregoing premises and as an inducement for Counterparty's execution, delivery and performance of the Agreements, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor hereby agrees for the benefit of Counterparty as follows:

*                    *                    *

**1.**     **GUARANTY.**   Subject to the terms and provisions hereof, Guarantor hereby absolutely and irrevocably guarantees the timely payment when due of all obligations of Obligor to Counterparty now or hereafter existing or arising from time to time under the Agreements (the "**Obligations**") and interest, if any, on the Obligations as well as costs of collection and enforcement of this Guaranty.  This Guaranty shall constitute a guarantee of payment and not of collection.

**2.**     **DEMANDS AND PAYMENT.**

**(a)**     If Obligor fails to pay any Obligation to Counterparty when such Obligation is due and owing under the Agreement (an "**Overdue Obligation**"), Counterparty may present a written demand to Guarantor calling for Guarantor's payment of such Overdue Obligation pursuant to this Guaranty (a "**Payment Demand**").

**(b)**     After issuing a Payment Demand, Counterparty shall not be required to issue any further notices or make any further demands with respect to the Overdue Obligation(s) specified in that Payment Demand, and Guarantor shall be required to make payment with respect to the Overdue Obligation(s) specified in that Payment Demand within five (5) Business Days after Guarantor receives such demand.  As used herein, the term "**Business Day**" shall mean all weekdays (*i.e.*, Monday through Friday) other than any weekdays during which commercial banks or financial institutions are authorized to be closed to the public in the State of Texas or the State of New York.

3.  **REPRESENTATIONS AND WARRANTIES.**  Guarantor represents and warrants that:

**(a)**   it is a [_____] duly organized and validly existing under the laws of the State of [_____] and has the corporate power and authority to execute, deliver and perform this Guaranty;

**(b)**   the execution, delivery and performance of this Guaranty and all other instruments, documents and agreements required by the provisions of this Guaranty to be executed, delivered and performed by Guarantor have been duly authorized by all necessary company action on the part of Guarantor;

**(c)**   no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution, delivery and performance of this Guaranty; and

**(d)**   this Guaranty constitutes a valid and legally binding agreement of Guarantor, enforceable against Guarantor in accordance with the terms hereof, except as the enforceability thereof may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

4.  **RESERVATION OF CERTAIN DEFENSES.**  Guarantor reserves to itself all rights, setoffs, counterclaims and other defenses to which Obligor is or may be entitled arising from or out of the Agreement, except as otherwise provided herein and except for defenses (if any) based upon the bankruptcy, insolvency, reorganization, moratorium, dissolution or liquidation of Obligor or any lack of power or authority or failure of Obligor to execute, deliver and perform the Agreement.  Until such time as all Obligations have been indefeasibly paid in full, Guarantor shall have no right to assert, enforce or exercise any right of subrogation or similar right or defense in respect of the Obligations.

5.  **AMENDMENT OF GUARANTY.**  No term or provision of this Guaranty shall be amended, modified, altered, waived or supplemented except in a writing signed by Guarantor and Counterparty.

6.  **WAIVERS AND CONSENTS.**

**(a)**   Except as required in *Section 2* above, Guarantor hereby waives (i) notice of acceptance of this Guaranty; (ii) presentment and demand; and (iii) any right to require that any action or proceeding be brought against Obligor or any other person, or to require that Counterparty seek enforcement of any performance against Obligor or any other person, prior to any action against Guarantor under the terms hereof.

**(b)**   No delay by Counterparty in the exercise of (or failure by Counterparty to exercise) any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from its obligations hereunder.  No change in law, regulation or order affecting any Obligation or right with respect thereto, or any other circumstances which may constitute a defense available to or discharge of an obligor or guarantor, shall impair or release Guarantor's obligations hereunder.

**(c)**   Without notice to or the consent of Guarantor, and without impairing or releasing Guarantor's obligations under this Guaranty, Counterparty may: (i) change the manner, place or terms for payment of all or any of the Obligations (including renewals, extensions or other alterations of the Obligations); (ii) release any person from liability for payment of all or any of the Obligations; or

(iii) receive, substitute, surrender, exchange or release any collateral or other security for any or all of the Obligations.

**(d)**    This Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any limitation, impairment or discharge for any reason (other than indefeasible payment in full of the Obligations and as otherwise set forth in this Guaranty), including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (A) any failure to assert or enforce, or agreement not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations; (B) any waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions of the Agreements or any agreement or instrument executed pursuant thereto or of any other guaranty or security for the Obligations; (C) the Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (D) the personal or corporate incapacity of Obligor or any other person; (E) the bankruptcy, receivership or insolvency of Obligor or any other person, or the discharge of Obligor or any other person's obligations in any bankruptcy, receivership or similar proceeding; (F) any merger or consolidation of Obligor or Guarantor into or with any other person, or any sale, lease or transfer of any of the assets of Obligor or Guarantor to any other person, (G) any change in the ownership of any interests of Obligor or any change in the relationship between Obligor and Guarantor, or any termination of such relationship or (H) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of Guarantor as an obligor in respect of the Obligations.

**(e)**    Guarantor's liability under this Guaranty shall be irrespective of the waivers and consents above.

**7.**    <u>**REINSTATEMENT.**</u>  Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if all or any part of any payment made hereunder is at any time avoided or rescinded or must otherwise be restored or repaid by Counterparty as a result of the bankruptcy, insolvency, reorganization, moratorium, dissolution or liquidation of Obligor, all as though such payments had not been made.

**8.**    <u>**TERMINATION.**</u>  This Guaranty and the Guarantor's obligations hereunder will terminate automatically and immediately upon the termination or expiration of all Agreements; *provided*, *however*, that no such termination or expiration shall affect Guarantor's liability with respect to any Obligation incurred prior to the time the termination is effective, which Obligation shall remain subject to this Guaranty.

**9.**    <u>**NOTICE.**</u>  Any Payment Demand, notice, request, instruction, correspondence or other document to be given hereunder (herein collectively called "**Notice**") by Counterparty to Guarantor, or by Guarantor to Counterparty, as applicable, shall be in writing and may be delivered either by (i) U.S. certified mail with postage prepaid and return receipt requested, or (ii) recognized nationwide courier service with delivery receipt requested, in either case to be delivered to the following address (or to such other U.S. address as may be specified via Notice provided by Guarantor or Counterparty, as applicable, to the other in accordance with the requirements of this *Section 9*):

| *TO GUARANTOR: \** | *TO COUNTERPARTY:\** |
|---|---|

3

| | Midship Pipeline Company, LLC<br>c/o Cheniere Energy, Inc.<br>700 Milam Street, Suite 1900<br>Houston, Texas 77002<br>*Attn:*  Treasurer |
|---|---|
| _____<br>_____<br>_____<br>*Attn:*  _____ | |
| *[Tel: (___) ___-___  -- for use in connection with courier deliveries]* | *Tel: (713) 375-5000  -- for use in connection with courier deliveries* |

> \*   (*NOTE*:  Copies of any Notices to Counterparty under this Guaranty shall also be sent to Credit Risk Management at _collateral@cheniere.com_ or 713-375-6170 and to Legal Department c/o Cheniere Energy, Inc. at 700 Milam Street, Suite 1900, Houston, Texas 77002.  However, such transmissions shall not be deemed effective for delivery purposes under this Guaranty.)

Any Notice given in accordance with this *Section 9* will (i) if delivered during the recipient's normal business hours on any given Business Day, be deemed received by the designated recipient on such date, and (ii) if not delivered during the recipient's normal business hours on any given Business Day, be deemed received by the designated recipient at the start of the recipient's normal business hours on the next Business Day after such delivery.

10.   **MISCELLANEOUS.**

(a)     This Guaranty shall in all respects be governed by, and construed in accordance with, the law of the State of New York, without regard to principles of conflicts of laws thereunder (other than Section 5-1401 and 5-1402 of the New York General Obligations Law).

(b)     This Guaranty shall be binding upon Guarantor and its successors and permitted assigns and inure to the benefit of and be enforceable by Counterparty and its successors and permitted assigns. Guarantor may not assign this Guaranty in part or in whole without the prior written consent of Counterparty.

(c)     This Guaranty embodies the entire agreement and understanding between Guarantor and Counterparty and supersedes all prior agreements and understandings relating to the subject matter hereof.

(d)     The headings in this Guaranty are for purposes of reference only, and shall not affect the meaning hereof.  Words importing the singular number hereunder shall include the plural number and vice versa, and any pronouns used herein shall be deemed to cover all genders.  The term "person" as used herein means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association, or government (or any agency or political subdivision thereof).

(e)     Wherever possible, any provision in this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any one jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**(f)**     Counterparty (by its acceptance of this Guaranty) and Guarantor each hereby irrevocably: (i) consents and submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York, or if that court does not have subject matter jurisdiction, to the exclusive jurisdiction of the Supreme Court of the State of New York, New York County (without prejudice to the right of any party to remove to the United States District Court for the Southern District of New York) for the purposes of any suit, action or other proceeding arising out of this Guaranty or the subject matter hereof or any of the transactions contemplated hereby brought by Counterparty, Guarantor or their respective successors or assigns; and (ii) waives (to the fullest extent permitted by applicable law) and agrees not to assert any claim that it is not personally subject to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court.

**(g)**     COUNTERPARTY (BY ITS ACCEPTANCE OF THIS GUARANTY) AND GUARANTOR EACH HEREBY IRREVOCABLY, INTENTIONALLY AND VOLUNTARILY WAIVES THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS GUARANTY, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON RELATING HERETO OR THERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY.

\*                \*                \*

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty on _____, 20__, but it is effective as of the Effective Date.

[_____]

By:_____

Name:_____

Title:_____

FINAL

## EXHIBIT D TO PRECEDENT AGREEMENT

## FORM OF IRREVOCABLE STANDBY LETTER OF CREDIT

### **[*ISSUING BANK*] IRREVOCABLE STANDBY LETTER OF CREDIT**

**DATE OF ISSUANCE:**
**[*Date of issuance*]**

Midship Pipeline Company, LLC ("**Beneficiary**")
c/o Cheniere Energy, Inc.
700 Milam Street, Suite 1900
Houston, Texas 77002

*Attention*:  [*Contact Person*]

Re:  [ISSUING BANK] Irrevocable Standby Letter of Credit No.  _____

Sirs/Mesdames:

We hereby establish in favor of Beneficiary (sometimes alternatively referred to herein as "**you**") this Irrevocable Standby Letter of Credit No. _____ (the "**Letter of Credit**") for the account of [_____] on behalf of [_____], located at [_____] ("**Account Parties**"), effective immediately and expiring on the date determined as specified in numbered paragraphs 5 and 6 below.

We have been informed that this Letter of Credit is issued pursuant to the terms of that certain Precedent Agreement, entered into as of March 15, 2017, by and between Beneficiary and Gulfport Energy Corporation

**1.** **Stated Amount.** The maximum amount available for drawing by you under this Letter of Credit shall be [*written dollar amount*] United States Dollars (US$[*dollar amount*]) (such maximum amount referred to as the "**Stated Amount**").

**2.** **Drawings.** A drawing hereunder may be made by you on any Business Day on or prior to the date this Letter of Credit expires by delivering to *[ISSUING BANK]*, at any time during its business hours on such Business Day, at *[bank address]* (or at such other address as may be designated by written notice delivered to you as contemplated by numbered *paragraph 9* hereof), a copy of this Letter of Credit together with (i) a Draw Certificate executed by an authorized person substantially in the form of *Attachment A* hereto (the "**Draw Certificate**"), appropriately completed and signed by your authorized officer (signing as such) and (ii) your draft substantially in the form of *Attachment B* hereto (the "**Draft**"), appropriately completed and signed by your authorized officer (signed as such).  Partial drawings and multiple presentations may be made under this Letter of Credit.  Draw Certificates and Drafts under this Letter of Credit may be presented by Beneficiary by means of facsimile or original documents sent by overnight delivery or courier to *[ISSUING BANK]* at our address set forth above, *Attention*: _____ (or at such other address as may be designated by written notice delivered to you as contemplated by numbered *paragraph 9* below). ).  If presentation is made by facsimile transmission, you must contact us at **[insert phone number]** to confirm our receipt of the transmission.  In the event of a presentation by facsimile transmission, the original of such documents need not be sent to us.

**3.** **Time and Method for Payment.** We hereby agree to honor a drawing hereunder made in compliance with this Letter of Credit by transferring in immediately available funds the amount specified in the Draft delivered to us in connection with such drawing to such account at such bank in the United States as you may specify in your Draw Certificate.  If the Draw Certificate is presented to us at such address by 12:00 noon, [_____] time on any Business Day, payment will be made not later than our close of business on third succeeding business day and if such Draw Certificate is so presented to us after 12:00 noon, [_____] time on any Business Day, payment will be made on the fourth succeeding Business Day. In clarification, we agree to honor the Draw Certificate as specified in the preceding sentences, without regard to the truth or falsity of the assertions made therein.

4.       **Non-Conforming Demands.**  If a demand for payment made by you hereunder does not, in any instance, conform to the terms and conditions of this Letter of Credit, we shall give you prompt notice that the demand for payment was not effectuated in accordance with the terms and conditions of this Letter of Credit, stating the reasons therefor and that we will upon your instructions hold any documents at your disposal or return the same to you. Upon being notified that the demand for payment was not effectuated in conformity with this Letter of Credit, you may correct any such non-conforming demand.

5.       **Expiration.**  This Letter of Credit shall automatically expire at the close of business on the date on which we receive a Cancellation Certificate in the form of *Attachment C* hereto executed by your authorized officer and sent along with the original of this Letter of Credit and all amendments (if any).

6.       **Initial Period and Automatic Rollover.**  The initial period of this Letter of Credit shall terminate on [*one year from the issuance date*] (the "**Initial Expiration Date**").   The Letter of Credit shall be automatically extended without amendment for one (1) year periods from the Initial Expiration Date or any future expiration date, unless at least thirty (30) days prior to any such expiration date we send you notice by registered mail or courier at your address first shown (or such other address as may be designated by you as contemplated by numbered *paragraph 9*) that we elect not to consider this Letter of Credit extended for any such additional one year period.

7.       **Business Day.**  As used herein, "**Business Day**" shall mean any day on which commercial banks are not authorized or required to close in the State of [New York], and inter-bank payments can be effected on the Fedwire system.

8.       **Governing Law.**  THIS LETTER OF CREDIT IS GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AND, EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, TO THE INTERNATIONAL STANDBY PRACTICES, ICC PUBLICATION NO. 590 (THE "ISP98"), AND IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

9.       **Notices.**  All communications to you in respect of this Letter of Credit shall be in writing and shall be delivered to the address first shown for you above or such other address as may from time to time be designated by you in a written notice to us.  All documents to be presented to us hereunder and all other communications to us in respect of this Letter of Credit, which other communications shall be in writing, shall be delivered to the address for us indicated above, or such other address as may from time to time be designated by us in a written notice to you.

10.      **Irrevocability.**  This Letter of Credit is irrevocable.

11.      **Complete Agreement.**  This Letter of Credit sets forth in full our undertaking, and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein, except for the ISP98 and *Attachment A*, *Attachment B* and *Attachment C* hereto and the notices referred to herein and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement except as set forth above.

*              *              *

Sincerely,

[ISSUING BANK]

_____

By:  _____

Title: _____
Address:

**ATTACHMENT A**

**FORM OF DRAW CERTIFICATE**

The undersigned hereby certifies to [*ISSUING BANK*] ("**Issuer**"), with reference to Irrevocable Letter of Credit No. _____ (the "**Letter of Credit**") issued by Issuer in favor of the undersigned ("**Beneficiary**"), as follows:

(1)　　The undersigned is the _____ of Beneficiary and is duly authorized by Beneficiary to execute and deliver this Certificate on behalf of Beneficiary.

(2)　　Pursuant to that certain Precedent Agreement dated March 15, 2017, between Beneficiary and [Gulfport Energy Corporation], Beneficiary hereby makes demand against the Letter of Credit by Beneficiary's presentation of the draft accompanying this Certificate, for payment of _____ U.S. dollars (US$_____), which amount, when aggregated together with any additional amount that has not been drawn under the Letter of Credit, is not in excess of the Stated Amount (as in effect of the date hereof).

(3)　　The conditions for a drawing by Beneficiary are pursuant to [*describe the draw conditions from the underlying agreement*].

(4)　　The amount demanded hereby represents funds due and owing by the Applicant and said amount has not been previously paid.  The amount demanded hereby, when received, will be used to satisfy the funds due and owing by the Applicant.

(5)　　You are hereby directed to make payment of the requested drawing to: (insert wire instructions)

　　　　　　Beneficiary Name and Address:

　　　　　　_____

　　　　　　_____

　　　　　　_____

(6)　　Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Letter of Credit.

MIDSHIP PIPELINE COMPANY, LLC

By: _____

Title: _____

Date: _____

**ATTACHMENT B**

**DRAWING UNDER IRREVOCABLE LETTER OF CREDIT NO. _____**


Date:


PAY TO:          Midship Pipeline Company, LLC


U.S.$ **_____**


FOR VALUE RECEIVED AND CHARGE TO THE ACCOUNT OF LETTER OF CREDIT NO. _____.


MIDSHIP PIPELINE COMPANY, LLC


By: _____

Title: _____

Date: _____

**ATTACHMENT C**

**<u>CANCELLATION CERTIFICATE</u>**

Irrevocable Letter of Credit No. _____

The undersigned, being authorized by the undersigned ("**Beneficiary**"), hereby certifies on behalf of Beneficiary to *[ISSUING BANK]* ("**Issuer**"), with reference to Irrevocable Letter of Credit No. _____ issued by Issuer to Beneficiary (the "**Letter of Credit**"), that [_____] is not currently required to post the Letter of Credit under that certain Precedent Agreement, entered into as of March ___, 2017, by and between Beneficiary and [_____],.

Pursuant to <u>Section 5</u> thereof, the Letter of Credit shall expire upon Issuer's receipt of this certificate.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Letter of Credit.

MIDSHIP PIPELINE COMPANY, LLC

By: _____

Title: _____

Date: _____

**FINAL**

**EXHIBIT E TO PRECEDENT AGREEMENT**

**ILLUSTRATIVE MILESTONE DATES**

| <u>Milestone</u> | <u>Start</u> | <u>Completion</u> |
|---|---|---|
| Pre-Filing | November 2016 | April 2017 |
| Open Season | March 2017 | March 2017 |
| FERC Certificate Review | April 2017 | April 2018 |
| Pipe Order | May - September 2017 | |
| Compressor Order | June  2017 | |
| FERC NTP | May 2018 | |
| Construction | May 2018 | April 2019 |
| Initial Service to NGPL 801 | November 2018 | March 2019 |
| Commissioning | February  2019 | April 2019 |
| In-Service | April 2019 | |



E-1

**FINAL**

## EXHIBIT F TO PRECEDENT AGREEMENT

### FORM OF OPEN SEASON

# MIDSHIP PIPELINE COMPANY, LLC
## NOTICE OF BINDING OPEN SEASON
### March 16, 2017 – March 29, 2017

## PROJECT OVERVIEW

Midship Pipeline Company, LLC ("Midship") is pleased to announce the commencement of a binding Open Season for firm transportation capacity of up to 1,400,000 Dekatherms per day on a new interstate natural gas pipeline project to be developed by Midship (the "Midship Project"). This project will connect production from the emerging Sooner Trend Anadarko Basin Canadian and Kingfisher ("STACK") and South Central Oklahoma Oil Province ("SCOOP") plays in the Anadarko Basin to growing Gulf Coast and Southeast markets. Current infrastructure cannot accommodate the anticipated production growth from this region. The growing demand within the U.S. Gulf Coast and Southeast supports the movement of gas southward and eastward to serve expanding demand, including Liquefied Natural Gas ("LNG") exports.

Midship has entered into binding precedent agreements with Foundation Shippers and is committed to building the Midship Project.[1] Midship is seeking additional binding commitments from interested shippers to execute a Transportation Precedent Agreement ("TPA") for transportation service on the Midship Project. In order to obtain firm transportation capacity on the Midship Project during this binding Open Season, shippers must execute a binding TPA, which will be provided to interested Foundation Shippers upon receipt of an executed Confidentiality Agreement. The binding commitments submitted in connection with this binding Open Season (including, without limitation, the rates proposed as well as the receipt and delivery points preferred by bidders) will be included in determining, in Midship's sole discretion, the optimal size and design of the Midship Project.

The Midship Project will transport gas out of the SCOOP and STACK to access desirable markets via deliveries to existing market hubs such as TexOk near Atlanta, Texas and Perryville, Louisiana. As currently contemplated, the Midship Project is comprised of two zones:

- Zone 1 – Will consist of approximately 198 miles of 36-inch-diameter new build pipeline that will begin at or near the Okarche Processing Plant near Okarche, Oklahoma and end at Bennington, Oklahoma. The proposed new build facilities will include a total of three (3) compressor stations, eight (8) receipt meters, depending on shipper interest and the following two (2) laterals:

    - Chisholm Lateral – approximately 20 miles of 30-inch-diameter new build pipeline that will begin at the Chisholm Processing Plant in Kingfisher County and end on the mainline of the Midship project near the Okarche Processing Plant.

---

[1] MidShip is committed as of the launch of this Open Season to building Zone 1 of the Midship Project. The inclusion of Zone 2 in the final Midship Project, consisting of the leased capacity described herein, will depend upon the level of interest in proposed Zone 2 capacity in the Open Season, and determined at Midship's sole discretion.

- <u>Velma Lateral</u> – approximately 13 miles of 12-inch-diamater new build pipeline that will begin at the Velma Processing Plant in Stephens County and connects to the Sholem Processing Plant ending in Garvin County.

- <u>Zone 2</u> – Will consist of approximately 353 miles of pipeline capacity leased from the existing Midcontinent Express Pipeline and/or Gulf Crossing pipelines, operated by Kinder Morgan and Boardwalk Partners, respectively. The proposed leased capacity will begin at Bennington, Oklahoma and end near Tallulah, Louisiana. Depending on approval of the lease or leases, up to three (3) delivery meters are planned at Bennington to receive gas from Zone 1.

The scheduled in-service date for the Midship Project is early 2019.

## CHARACTERISTICS OF SERVICE

Midship is offering Firm Transportation Service ("FTS") from and to shipper-determined Primary Receipt and Delivery locations.

## MIDSHIP PROJECT MAP



## MIDSHIP POTENTIAL RECEIPT AND DELIVERY LOCATIONS

Potential Receipts

- EnLink Chisholm Plant
- DCP Okarche Plant
- MarkWest [Kingfisher] Plant
- Oneok Canadian Valley Plant
- EnLink Cana Plant
- WEX Grady Plant
- Targa Velma Plant
- DCP Sholem Plant
- ARM Midstream Kingfisher Plant
- Enable Calumet Plant
- DCP Chitwood Plant
- Enable Cox City Plant
- Enable Bradley Plant
- Enable Wildhorse Plant
- Or others as requested by shipper and approved by Midship

Potential Deliveries

- Lamar, Paris County, TX
- MidContinent Express Pipeline, Bennington, OK
- Gulf Crossing Pipeline, Bennington, OK
- NGPL, Bennington, OK
- NGPL TexOK, Cass County, TX
- Perryville, LA
- Or others as requested by shipper and approved by Midship

## TRANSPORTATION RATES

- Recourse Rates[2] will be established once the final scope defining the Midship Project has been determined. The final scope will be based on shipper commitments and Midship's determination of the economic viability of providing FTS from the desired Receipt Points to the Delivery Points. For purposes of this Open Season, the maximum recourse reservation rates are currently expected to be as follows: $0.42/Dth – $0.45/Dth.

- Negotiated Rates will be considered, including for shippers making commitment entitling them to status as Foundation Shippers (as further explained below). Terms of negotiated rates will feature potential rate-related incentives for Foundation Shippers as further explained below.

- All Rates will be reservation charge-based ($/Dth/day). Actual invoiced rates will include the addition of Annual Charge Adjustment ("ACA") and any additional surcharges that are in effect pursuant to Midship's FERC NGA Gas Tariff, which may be revised from time to time.

---

[2] Recourse Rates are subject to review and approval by the Federal Energy Regulatory Commission ("FERC"), and are subject to revision from time to time thereafter pursuant to proceedings before the FERC under the Natural Gas Act.

- Fuel and gas lost and unaccounted for ("FLAUF") will be charged on volumes transported.  Midship estimates FLAUF to be up to approximately 1.4% for Zone 1 and approximately 0.6 to 1.0% for Zone 2, depending on the final scope and volumes transported, and length of haul on Zone 2.

## FOUNDATION SHIPPER(S)

The Midship Project has secured commitments from subsidiaries and/or affiliates of Cheniere Energy Inc., Devon Energy Corporation, Marathon Oil Corporation, and Gulfport Energy Corporation, and certain of these parties have met the qualifications of "Foundation Shippers".

The aforementioned shippers have executed binding TPAs for capacity on the Midship Project. The binding TPAs executed by these shippers have made it economic for Midship to commit to building the Midship Project. These TPAs have been determined to be prearranged conforming bids and the commitments of those shippers that have qualified as Foundation Shippers are not subject to prorationing during this binding Open Season, consistent with the Foundation Shipper benefits below.

Parties may submit binding bids for capacity commitments as either standard shippers or Foundation Shippers.

Foundation Shipper Qualifications and Incentives:

- Any shipper committing to at least 175,000 Dth/d with a minimum term of 10 years at the recourse or an acceptable negotiated rate will be considered a Foundation Shipper for all purposes hereunder, and under the TPA.

- A Foundation Shipper will receive priority with regard to allocation of the project capacity (if necessary, as described below).

- Foundation Shippers will be entitled to more favorable rate-related terms compared to standard shippers, including for FTS service and for interruptible service that may be offered by Midship on a non-discriminatory basis prior to the full in-service date of the Midship Project.  For example, Foundation Shippers will be entitled to negotiated rate adjustments in the event that certain Midship Project capacity subscription benchmarks are met, as well as negotiated reservation rate adjustments in the event of certain overrun and fuel reimbursement events, as further detailed in a Foundation Shipper's TPA.

- A Foundation Shipper will also be entitled to an option to extend the primary term of its transportation service agreement for up to two additional extension terms of up to five (5) years each, at an amount up to its then-current maximum daily quantity.

- Additionally, upon expiration of the primary term of a Shipper's transportation service agreement, a Foundation Shipper will be entitled to request a negotiation on terms for a renewal of the transportation service agreement, including negotiated rate, term, and path, and Midship will negotiate the terms of such an extension subject to the terms of its FERC NGA Gas Tariff.

- Midship will include in the Foundation Shipper's TPA a Most Favored Nations ("MFN") clause that will provide the Foundation Shipper with certain benefits related to the negotiated reservation rate for firm service.

- Foundation Shippers will be entitled to a Right of First Refusal at the conclusion of their transportation service agreement term, in accordance with the Tariff and notwithstanding their negotiated rates that may be below the applicable maximum recourse rate.

- Foundation Shippers will be entitled to certain rights to bid on and obtain capacity in a future open season for expansion capacity on the Midship Project, subject to applicable regulatory requirements.

- Foundation Shippers will have certain rights to adjust their capacity commitments during a defined period of time following the close of this binding Open Season and prior to the commencement of service, subject to capacity availability, applicable regulatory requirements, and certain other parameters as further explained in a Foundation Shipper's TPA.

## BINDING OPEN SEASON DATES

This binding Open Season will commence at 9:00 a.m. (CDT) on Thursday, March 16, 2017 and end at 3:00 p.m. (CDT) on Wednesday, March 29, 2017.

Midship reserves the right, upon notice and in its sole discretion, at any time during this binding Open Season to terminate this binding Open Season or to extend this binding Open Season period.

Questions regarding this binding Open Season should be directed to Michael Manteris, Sr. Director Business Development, at midshipopenseason@cheniere.com or (713) 375-5370.

## BINDING OPEN SEASON DOCUMENTS AND BID PROCESS

Any shipper desiring firm transportation service under the Midship Project must, on or before **3:00 p.m. (CDT) on Wednesday, March 29, 2017** (or such later date as may be announced by Midship): (i) complete and submit to Midship the Binding Bid for Firm Transportation Service request form ("Binding Bid Form") attached hereto as Attachment A; and (ii) provide Midship with an executed Confidentiality Agreement, attached hereto as Attachment B. The Binding Bid Form must include shipper name, contact information of the person completing the form, the desired maximum daily transportation quantity ("MDTQ"), contract term, receipt and delivery points maximum daily quantity ("MDQ"), and desired reservation rate for the term of the agreement. Upon receipt of the executed Binding Bid Form and Confidentiality Agreement, Miship will provide the form of TPA applicable to each shipper's desired commitment level.

All Binding Bid Forms and Confidentiality Agreements may be submitted to Michael Manteris, Sr. Director Business Development, at midshipopenseason@cheniere.com.

## CREDIT

A shipper will generally be deemed creditworthy if at all times from the effective date of its TPA and throughout the term of its TPA if it maintains a long-term senior unsecured debt rating from both (1) Moody's Investor Service, Inc., or applicable successor agency ("Moody's") of Baa3 or higher and (2) Standards & Poor's or is successor agency ("S&P") of BBB- or higher, in the event both ratings are available; provided in that order to be deemed creditworthy under the preceding sentence. Shipper must maintain both of the aforementioned ratings. Alternatively, Shipper may be accepted as creditworthy by Transporter if Transporter determines that, notwithstanding the failure to meet or maintain the rating requirements as stated herein, the financial position of Shipper (or an entity that guarantees all of Shipper's payment obligations) is and remains reasonably acceptable to Transporter during the term of this Agreement and the Service Agreement. Different creditworthiness terms and credit support obligations may be agreed upon with Foundation Shippers on a non-discriminatory basis.

Non-creditworthy shippers will be required to provide credit assurances in the form of: (i) an irrevocable standby letter of credit from a Qualified Institution; (ii) a guaranty from an entity that is creditworthy under the standards applicable to Shipper as set forth above; (iii) a cash security deposit to be placed in a third party escrow account pursuant to a form of escrow agreement to be negotiated in good faith and executed and delivered by the parties and the relevant third party escrow agent; or (iv) a mutually agreeable alternative form of credit assurance. Additional and/or different terms of credit support and creditworthiness determinations may be considered on a non-discriminatory basis depending on an evaluation of a particular shipper's credit profile, including with respect to Foundation Shippers.

## RESPONSE TO BIDS IN THE BINDING OPEN SEASON

All shippers who submit a Binding Bid Form will be contacted following close of the binding Open Season with an indication of whether or not capacity will be awarded. Shippers will have thirty (30) days to execute a TPA if one has not already been executed.

## AWARDING OF CAPACITY

Midship will award the transportation capacity using the method outlined here:

- Midship will award transportation capacity to those making bids other than Foundation Shippers, based on the highest net present value ("NPV") of each bid per unit of capacity. A ratable allocation (or proration) will be utilized for non-Foundation Shippers in the event that the aggregate amount of bids exceeds the project capacity.

Midship estimates that a term commitment of at least ten (10) years will be required to support the Project. Any bid with a minimum term of less than ten years will be non-conforming, but will be considered based on NPV.

If a successful bidder fails to execute a TPA in the allotted time, the awarded capacity will be awarded to the next highest NPV bidder.

## LIMITATIONS

Midship reserves the right to not accept any conditions for bids submitted during this binding Open Season. Midship reserves the right to discontinue or modify the terms of this binding Open Season or the scope of the Midship Project at any time regardless of request for service received, in its sole discretion. Midship's decision to proceed with the Project is at its sole discretion and is subject to receiving a sufficient level of capacity subscriptions, obtaining the necessary governmental authorizations to construct and operate Midship, and other conditions as set forth in the form of Transportation Precedent Agreement.

Attachment A

**MIDSHIP PIPELINE COMPANY, LLC**
**BINDING BID FOR FIRM TRANSPORTATION SERVICE**
<span style="color:red">Please return this Binding Bid Form by 3:00 p.m. (CST) on Wednesday, March 29, 2017</span>

A.   **Shipper Name**:

Contact Person:  _____

Title:  _____

Address:  _____

Courier Address:  _____

Telephone:  _____

E-Mail Address:  _____

B.   **Service Type**: Firm Transportation Service (FTS)

C.   **Primary Term of Service**: _____ years (from the In-Service date)

D.   **Maximum Daily Transportation Quantity (MDTQ)**:   _____ Dth/d

E.   **Primary Receipt / Delivery Point(s)**:

| Primary Receipt Point(s) | Requested Quantity (Dth/d) |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
|                    Total | _____ |

| Primary Delivery Point(s) | Requested Quantity (Dth/d) |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
|                    Total | _____ |

1

F.     **Reservation Rate for Zone 1**:

     1.   Recourse Reservation Rate, Maximum Tariff Rate _____ (check if applicable),

        Or

     2.   Proposed Negotiated Reservation Rate ($/Dth/d): _____ (insert rate if applicable)

G.     **Reservation Rate for Zone 2**:

     1.   Recourse Reservation Rate, Maximum Tariff Rate _____ (check if applicable),

        Or

     2.   Proposed Negotiated Reservation Rate ($/Dth/d): _____ (insert rate if applicable)

ACA, fuel and lost and unaccounted for gas ("FLAUF") and any other authorized surcharge will be in addition to the Shipper's bid rate. Midship estimates that the retainage for fuel, lost and unaccounted for gas will be approximately 1.4% for Zone 1 and approximately 0.6 to 1.0% for Zone 2, depending on the final scope and volumes transported, and length of haul on Zone 2.

H.     **Partial Award of Capacity:**

Please indicate whether Shipper is willing to accept a partial award of capacity in the event there is a tie and 100% of your bid cannot be awarded.

    Yes _____      No _____

If Yes, please state the minimum percentage acceptable: _____

Shipper understands that this Binding Bid Form, complete and unrevised as to format, must be received by Midship before the transportation request will be accepted and processed.

Shipper, by its signature, represents to Midship that the information above and accurate.

                    _____
                    Signature
                    _____
                    Printed Name and Title

                    Telephone No. _____

                    Fax No. _____

                    Email: _____

FINAL

**EXHIBIT G TO PRECEDENT AGREEMENT**

**DESCRIPTION OF PROJECT AND MAP**

**(In the event of any inconsistency between the description set forth in this Exhibit G and the attached map, the description set forth in this Exhibit G shall be controlling in all respects)**

<u>**Project Description**</u>

<u>Mainline</u> - Approximately 189 miles of 36" and 7 miles of 30" mainline pipeline capable of moving up to 900,000 – 1,000,000 Dth/d from the STACK and any additional volume required from the SCOOP, until the maximum pipeline capacity of 1,400,000 Dth/d is reached from the Receipt Points to the Delivery Points listed below.  Transporter shall be obligated to receive gas deliveries from Shipper that meet the specifications stated below for each Receipt Point. Transporter shall regulate pressure on the system to ensure that Transporter will be able to accept the volumes nominated by Shipper at the Receipt Points at pressure levels not to exceed the maximum pressure level as noted for each Receipt Point below.  In the event that Transporter is unable to receive Shipper's gas at any Receipt Point due to pressures exceeding the maximum pressures noted below for that Receipt Point and, therefore, is unable to provide Firm Service, the Reservation Charge Credits would apply in accordance with Section 5.1.9 of Transporter's Rate Schedule FTS or Section 6.8(E) of Transporter's General Terms and Conditions.

**FINAL**

## Laterals

- Chisholm Lateral – Approximately 26.5 miles of 24" pipeline capable of moving up to 500,000 Dth/d
- Cana Lateral – Approximately 2.5 miles of 24" pipeline capable of moving approximately 400,000 Dth/d
- Velma Lateral – approximately 14 miles of 12" pipeline capable of moving up to 110,000 Dth/d

## Compression

- Compressor Station 1
  - Milepost 17.5
  - Installed Horsepower up to 18,390
- Compressor Station 2
  - Milepost 98.9
  - Installed Horsepower up to 29,305
- Compressor Station 3
  - Milepost 197.9
  - Installed Horsepower up to 34,090

## Receipt Points[1]

- Enlink Chisholm
  - Meter Capacity – 500 MMCFD
  - Chromatograph
  - Flow Control
  - Ultrasonic measurement with EFM and DAS capabilities
  - Shipper shall not be required to deliver above 1100 psig
  - Transporter shall not operate the receipt point at a pressure higher than 1100 psig unless mutually agreed upon by both parties
- Oneok Canadian Valley
  - Meter Capacity – 300 MMCFD
  - Chromatograph
  - Flow Control
  - Ultrasonic measurement with EFM and DAS capabilities
  - Shipper shall not be required to deliver above 1100 psig
  - Transporter shall not operate the receipt point at a pressure higher than 1100 psig unless mutually agreed upon by both parties
- Enlink Cana
  - Meter Capacity – 400 MMCFD
  - Chromatograph
  - Flow Control
  - Ultrasonic measurement with EFM and DAS capabilities
  - Shipper shall not be required to deliver above 1000 psig
  - Transporter shall not operate the receipt point at a pressure higher than 1000 psig unless mutually agreed upon by both parties
- WEX Grady
  - Meter Capacity – 350 MMCFD
  - Chromatograph
  - Flow Control
  - Ultrasonic measurement with EFM and DAS capabilities
  - Shipper shall not be required to deliver above 1150 psig
  - Transporter shall not operate the receipt point at a pressure higher than 1150 psig unless mutually agreed upon by both parties
- Targa Velma
  - Meter Capacity – 110 MMCFD
  - Chromatograph
  - Flow Control

---

[1] Transporter will have in place an appropriate Operational Balancing Agreement with each relevant Receipt Point operator on or prior to the Commencement Date.

**FINAL**

- o Ultrasonic measurement with EFM and DAS capabilities
- o Shipper shall not be required to deliver above 850 psig
- o Transporter shall not operate the receipt point at a pressure higher than 850 psig unless mutually agreed upon by both parties

## Delivery Points[2]

- MEP Bennington
  - o Meter Capacity – 1,000 MMCFD
  - o Chromatograph
  - o Flow Control
  - o Ultrasonic measurement with EFM and DAS capabilities
  - o Transporter Maximum Delivery Pressure Obligation – 1320 psig
- Gulf Crossing Bennington
  - o Meter Capacity – 1,000 MMCFD
  - o Chromatograph
  - o Flow Control
  - o Ultrasonic measurement with EFM and DAS capabilities
  - o Transporter Maximum Delivery Pressure Obligation – 1320 psig
- NGPL Bennington
  - o Meter Capacity – 250 MMCFD
  - o Flow Control
  - o Ultrasonic measurement with EFM and DAS capabilities
  - o Transporter Maximum Delivery Pressure Obligation – 1100 psig
- NGPL 801
  - o Meter Capacity – 300 MMCFD
  - o Flow Control
  - o Ultrasonic measurement with EFM and DAS capabilities
  - o Transporter Maximum Delivery Pressure Obligation -            psig

---

[2] Transporter will have in place an appropriate Operational Balancing Agreement with each relevant Delivery Point operator on or prior to the Commencement Date.

**FINAL**

